UNITED STATES of America,
Plaintiff–Appellant,

v.

Eric GAGNON, Defendant–Appellee.

No. 03–1203.

United States Court of Appeals,
Second Circuit.

Argued: Jan. 21, 2004.

Decided: July 1, 2004.

William C. Pericak, Assistant United States Attorney (Carlos C. Moreno, Assistant United States Attorney, on the brief) for Glenn T. Suddaby, United States Attorney for the Northern District of New York, Syracuse, NY, for appellant.

Thomas J. O'Hem, Gerstenzang, O'Hern, Hickey & Gerstenzang, New York, NY, for appellee.

Before: KATZMANN, and B.D. PARKER, Circuit Judges, PRESKA, District Judge[1].

PRESKA, District Judge.

## BACKGROUND[2]

On or about April 4, 2002, United States Customs Agents detained Daniel Simoneau, a Canadian driving a tractor trailer, as he attempted to enter the Port of Champlain because they had discovered 142 pounds of marijuana hidden in the trailer. (Appendix for the United States of America ("GA") 218.)[3] Simoneau told Customs Agents that he was en route to deliver the trailer to Eric Gagnon, at the Fox Run restaurant and motel at Exit 21B of the New York State Thruway. (*Id.*) Simoneau described for the Agents the tractor trailer that Gagnon was supposed to be driving, including the fact that the trailer would bear the name "Lanfort" on its side. (*Id.*)

United States Customs Agent Todd Harris conveyed the information provided by Simoneau to New York State Police Sergeant Anthony Miserendino. Sergeant Miserendino passed the information along to New York State Police Trooper Roy Swan, who was responsible for patrolling the section of the New York State Thruway that includes Exit 21B. (*Id.*)

At approximately 7:20 p.m., Trooper Swan notified Sergeant Miserendino that the tractor trailer that Simoneau had described had just pulled into the Fox Run truck stop at Exit 21B of the New York State Thruway. (*Id.*) As instructed by Sergeant Miserendino, Trooper Swan maintained visual surveillance of the truck until Agent Harris and Sergeant Miserendino arrived at the truck stop. (*Id.*) The Fox Run truck stop has at least two buildings, one of which comprises a restaurant, a bar, and an area where billing for fuel and motel transactions are completed. The other houses the motel. (*Id.* at n. 2.)

Shortly after Agent Harris and Sergeant Miserendino arrived at the truck stop, they were joined by Trooper Swan, Trooper McTauge, Trooper Berrera and Trooper Monihan. (*Id.* at 219; *see also id.* at 11) (Agent Harris, Sergeant Miserendino, Trooper Swan, Trooper McTauge, and the other New York State troopers on the scene are collectively referred to hereinafter as the "Officers.") Agent Harris, Sergeant Miserendino and Trooper McTauge

1. The Honorable Loretta A. Preska, of the United States District Court for the Southern District of New York, sitting by designation.

2. The facts are taken from the record before the district court leading to the order appealed from and are contained in three decisions: (i) an unreported omnibus decision dated July 23, 2002, in which the district court determined, *inter alia*, that the Government had failed to establish that it had probable cause to search the defendant's tractor trailer ("July 23 Order") (GA 209–216); (ii) an Order dated November 6, 2002, reported at 230 F.Supp.2d 260 (N.D.N.Y.2002), in which the district court found that the defendant did not voluntarily consent to the search of his tractor trailer and suppressed the evidence obtained, rejecting the "plain view exception" and the

"automobile exception" as justification for the search ("November 6 Order") (GA 217–228); and (iii) a decision dated March 11, 2003, reported at 250 F.Supp.2d 15 (N.D.N.Y.2003), in which the district court denied the Government's motion for reconsideration of the court's prior probable cause determination and its prior decision suppressing the evidence obtained ("March 11 Order") (GA 229–234).

3. The July 23 Order states that Simoneau was hauling a tractor-trailer containing "142 pounds of marijuana" (GA 210), whereas the November 6 Order states Simoneau was found hauling "144 pounds of marijuana" (GA 218). For the sake of consistency, we shall refer herein to the amount set forth in the July 23 Order.

went inside the motel to speak to the desk clerk, who was later identified as one Sullivan. (*Id.* at 219.) Sullivan told the Officers that Eric Gagnon had just checked into the motel and that he was in the restaurant. (*Id.*)

Agent Harris, Sergeant Miserendino and Trooper McTauge conferred among themselves, and then Agent Harris telephoned the United States Attorney's Office to inquire as to what the Officers should do if the defendant refused to allow the Officers to search his tractor trailer. (*Id.*) According to Agent Harris, the Assistant United States Attorney with whom he spoke told him that he did not have probable cause. (*Id.; see also* GA 117, 135.) There is no indication in the record of what Agent Harris told the Assistant. In a footnote, the district court noted that:

> Agent Harris claimed that he was told they would not have probable cause to search the tractor trailer. (Tr., p. 117). Later, he claimed that he was told they did not have the probable cause necessary to obtain a search warrant. (Tr., p. 135).

(GA 219 n. 3.)

Agent Harris, Sergeant Miserendino, and Trooper McTauge approached the defendant in the restaurant, and Sergeant Miserendino asked him if he was Eric Gagnon; the defendant confirmed that he was and produced his Canadian commercial driver's license as requested. (GA 219–220.) In response to Sergeant Miserendino's question of what he was doing at the rest stop, Gagnon said that he was resting and that he would be traveling to Albany to pick up some recyclable goods. (*Id.* at 220.) Sergeant Miserendino then asked Gagnon if he knew "Daniel Simoneau." (*Id.;* GA 168.) As will be discussed below, although the district court found "[u]pon hearing the name 'Daniel,' but not together with the name 'Gagnon,'

Gagnon responded 'Daniel Gagnon, my brother[,] I know,'" (GA 220), the transcript of the suppression hearing reflects that defendant denied knowing Simoneau. (GA 168, 186.)

When Sergeant Miserendino told Gagnon that the Officers wanted to see his tractor trailer, Agent Harris, Sergeant Miserendino, the other officers, and the defendant left the restaurant and went to the defendant's tractor trailer. (GA 220.) According to the defendant, he was not hand-cuffed or otherwise forcefully led to the tractor trailer; rather he "follow[ed]" the Officers to it. (GA 169–170.) When they arrived at the tractor trailer, two officers entered the trailer to inspect it. (GA 220.) The defendant testified that the doors were not locked, (GA 170), that one of the officers opened the right-hand door so that the Officers could enter the trailer, (*id.*) and that he did not mind that the Officers looked inside the trailer, (GA 188–9). Two officers climbed into the trailer and found it to be empty. (GA 220.) The defendant also testified that the Officers then "asked [him] to unlock the truck, the cab ..." and he "unlocked it and then ... opened it." (GA 171.) Sergeant Miserendino then entered the cab of the tractor trailer, and Gagnon indicated that he did not want Sergeant Miserendino in the cab because, he testified, he was afraid the officer was going to get his truck dirty. (GA 172, 220.) Sergeant Miserendino proceeded to the rear of the cab, observed a zippered blue duffle bag and grabbed it to determine if it had clothes in it because Gagnon had indicated that he was carrying clothes. (GA 221.) Upon determining that the contents were not clothes but "some sort of paper product or books or something of a hard nature," Sergeant Miserendino opened the bag and discovered approximately $305,000 in currency.

(*Id.*) Officers seized the currency and arrested the defendant. (*Id.*)

## PROCEDURAL BACKGROUND

As noted above, three orders of the district court form the basis for this interlocutory appeal. First, in response to defendant Gagnon's motion to suppress the $305,000 in currency seized from his truck, the district court held in the July 23 Order that probable cause to search did not exist. (GA 214–215.) The court stated:

> Thus, the issue is whether probable cause to arrest defendant existed prior to the search of his truck. "Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonable trustworthy information to justify a person of reasonable caution in believing that an offense has been committed by the person to be arrested." *United States v. Patrick,* 899 F.2d 169, 171 (2d Cir.1990). The Government points to the seizure of 142 pounds of marijuana at the border in support of its argument. However, this seizure was related to defendant only through the information given by Simoneau. Although Simoneau described the "Lanfort" trailer his contact was to be driving and the exit at which they were supposed to meet, the law enforcement agents had no experience upon which to base the credibility of Simoneau's information. Upon arriving at the exit, the agents did observe a "Lanfort" truck. However, defendant was not at the trailer. Rather, the agents searched him out at a restaurant. Upon questioning by the agents, defendant set forth his intended itinerary and stated that he was not meeting anyone there. Moreover, defendant was not evasive or inconsistent in his answers to the agents' inquiry. Mere presence at a New York State Thruway exit with a certain type of vehicle, despite the description of the exit and vehicle by someone arrested with 142 pounds of marijuana, is insufficient to establish probable cause to arrest.

(*Id.*) In that same order, the court set a hearing to determine if the defendant had consented to the search. (GA 215–16.)

In the November 6 Order, the district court held that Gagnon could not have exhibited actions or speech that would have indicated consent to a reasonable officer and, in any event, that Gagnon's purported consent had not been voluntary. (GA 226–27.) In addition, the district court noted that "the seizure in this case is not saved by any other exception to the warrant requirement." (GA 227 n.13.) As to the automobile exception, the court wrote:

> Likewise, the objects seized from the cab cannot be saved under the "automobile exception," which allows officers to conduct a warrantless search of containers within a car if they have probable cause to believe such containers contain contraband. *Wyoming v. Houghton,* 526 U.S. 295, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999). It has already been determined that the officers did not have probable cause to arrest Gagnon prior to the search. (See Docket No. 22, Memorandum Decision and Order granting in part and denying in part defendant's omnibus motion). In addition, the United States Attorney's Office itself told Harris that the officers did not have probable cause to search the cab without a warrant, or probable cause to get a warrant in the first place. (Tr., pp. 117–18, 136). This exception, thus, does not apply.

(GA 228 at 13.)

The Government moved for reconsideration of both orders, and the district court

denied the motion in the March 11 Order. The Government filed a timely notice of interlocutory appeal.

## DISCUSSION

### I. Standard of Review

■ "On an appeal from a ruling on a motion to suppress, we review a district court's findings of historical fact for clear error, but analyze *de novo* the ultimate determination of such legal issues as probable cause and the good faith of police officials in relying upon a warrant." *United States v. Smith,* 9 F.3d 1007, 1011 (2d Cir.1993). Thus, the district court's ultimate determination of whether probable cause to search a vehicle existed is reviewed *de novo, United States v. Joyner,* 201 F.3d 61, 74 (2d Cir.2000), including the question of whether the automobile exception is applicable, *United States v. Cope,* 312 F.3d 757, 775 (6th Cir.2002); *cert. denied,* —— U.S. ——, 124 S.Ct. 496, 157 L.Ed.2d 395 (2004); *see also Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

### II. Legal Principles

#### A. The Automobile Exception

■ "Under the 'automobile exception' to the Fourth Amendment warrant requirement, police may conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime." *United States v. Gaskin,* 364 F.3d 438, 456 (2d Cir.2004) (citing *Pennsylvania v. Labron,* 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996)). Furthermore, when the police possess probable cause to believe a vehicle contains contraband, "they may conduct a warrantless search of every part of the vehicle and its contents, including all containers and packages in the vehicle."

*United States v. Cruz,* 834 F.2d 47, 51 (2d Cir.1987) (citing *United States v. Ross,* 456 U.S. 798, 821 & n. 28, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)). The automobile exception is justified because a person's expectation of privacy in a vehicle is less than his or her expectation of privacy in a home and because a vehicle is readily movable. *See California v. Carney,* 471 U.S. 386, 390–92, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985); *United States v. Paulino,* 850 F.2d 93, 95–96 (2d Cir.1988). Here, neither party contends that the vehicle at issue was not mobile, and the undisputed evidence shows that it was. Thus, the only question presented is whether probable cause existed.

■ In *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Supreme Court abandoned its earlier two-pronged *Aguilar–Spinelli* test, *see Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), for assessing whether testimony by an informant could establish probable cause and instead "reaffirm[ed] the totality of the circumstances analysis that traditionally has informed probable cause determinations." *Id.* at 238, 103 S.Ct. 2317. In performing this examination of the "totality of the circumstances," however, the court may consider some of the same factors as were identified in *Aguilar* and *Spinelli,* including "an informant's veracity, reliability and basis of knowledge," *id.* at 230, 103 S.Ct. 2317 (internal quotation marks omitted), and the extent to which an informant's statements—even about a suspect's innocent activities—are independently corroborated, *id.* at 241–44, 103 S.Ct. 2317; *see also Caldarola v. Calabrese,* 298 F.3d 156, 162–63 (2d Cir.2002) (noting that, "[a]fter the Supreme Court's decision in *Illinois v. Gates,* . . . it is clear that [the reliability or

veracity of the informant and the basis for the informant's knowledge] are but two of several 'relevant considerations' when determining the existence of probable cause based on an informant's tip" and that "a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability").

█ As the *Gates* Court cautioned, "probable cause does not demand the certainty we associate with formal trials." *Id.* at 246, 103 S.Ct. 2317. Furthermore, "[t]he fact that an innocent explanation may be consistent with the facts as alleged ... does not negate probable cause." *United States v. Fama*, 758 F.2d 834, 838 (2d Cir.1985). Probable cause exists if a law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested. *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir.1990). Courts do not isolate each factor of suspicion but instead look to the totality of the circumstances. *Gates*, 462 U.S. at 230–31, 103 S.Ct. 2317.

B. Information Provided by Informants

█ Often the information needed to supply probable cause is not gathered independently by police officers but instead is provided by professional criminal informants, *Caldarola*, 298 F.3d at 163, witnesses to a particular event, *id.*, or participants in the crime at issue, *United States v. Jackson*, 560 F.2d 112, 121 (2d Cir.1977). In assessing the veracity of an informant's statements, "it is improper to discount" the information provided "simply because [the informant] has no proven record of truthfulness or accuracy." *United States*

*v. Canfield*, 212 F.3d 713, 719 (2d Cir.2000) (internal quotation marks omitted). There is, in particular, "no need to show past reliability when the informant ... is in fact a participant in the very crime at issue." *Jackson*, 560 F.2d at 121. However, although other circuits have recognized that criminals caught red-handed may be reliable sources of information because "[t]he informant's interest in obtaining leniency creat[es] a strong motive to supply accurate information," *United States v. Miller*, 925 F.2d 695, 699 (4th Cir.1991), we have also cautioned that a criminal informer is less reliable than an innocent bystander with "no apparent motive to falsify," *Caldarola*, 298 F.3d at 163 (internal quotation marks omitted). Whether or not the informant speaks to an officer in person or through the mediation of an anonymous means of communication may also bear upon the reliability of the information he provides; thus, a "face-to-face informant must ... be thought more reliable than an anonymous telephone tipster, for the former runs the greater risk that he may be held accountable if his information proves false." *United States v. Salazar*, 945 F.2d 47, 50–51 (2d Cir.1991); *accord Canfield*, 212 F.3d at 719.

In addition to considering an informant's veracity, reliability, and basis of knowledge, in assessing the totality of the circumstances we also evaluate whether the information an informant provides is corroborated by independent police investigation, *Canfield*, 212 F.3d at 719–20, because an informant who is right about some facts is more likely to be right about others, *Gates*, 462 U.S. at 241–46, 103 S.Ct. 2317. We consider such corroboration in evaluating the existence of probable cause even if only an informant's account of anticipated innocent activities is confirmed. *See Gates*, 462 U.S. at 244, 103 S.Ct. 2317 (holding that the corroboration of facts in

an anonymous informant's letter that the defendants' car would be in Florida, that one of the defendants would fly to Florida within the next day or so, and that the defendant would then drive towards Bloomington, Indiana, all contributed to a legitimate belief that the informant's additional assertions of criminal activity were true and probable cause had been established); *Canfield*, 212 F.3d at 720 (2d Cir. 2000) (corroboration of "innocent details" means that "there is a higher probability the incriminating facts are true"). *But see United States v. Pena*, 961 F.2d 333, 339 (2d Cir.1992) (remanding for a suppression hearing when the tip provided by a confidential informant whom the government claimed was "reliable" was corroborated only by innocent behavior).

III. Application

A. The District Court Improperly Discounted the Information Provided by Simoneau

In the July 23 Order the district court made the following findings regarding the weight it had given the information provided by Simoneau:

Although Simoneau described the "Lanfort" trailer his contact was to be driving and the exit at which they were supposed to meet, the law enforcement agents had no experience upon which to base the credibility of Simoneau's information. Upon arriving at the exit, the agents did observe a "Lanfort" truck. However, defendant was not at the trailer. Rather, the agents searched him

out at a restaurant. Upon questioning by the agents, defendant set forth his intended itinerary and stated that he was not meeting anyone there. Moreover, defendant was not evasive or inconsistent in his answers to the agents' inquiry. Mere presence at a New York State Thruway exit with a certain type of vehicle, despite the description of the exit and vehicle by someone arrested with 142 pounds of marijuana, is insufficient to establish probable cause to arrest.

(GA 215–16.)

In the November 6 Order, the district court summarily rejected the automobile exception as justification for the search by reference to its July 23 Order:

Likewise, the objects seized from the cab cannot be saved under the "automobile exception," which allows officers to conduct a warrantless search of containers within a car if they have probable cause to believe such containers contain contraband. It has already been determined that the Officers did not have probable cause to arrest Gagnon prior to the search.

(GA 228 (citations omitted).)

 Here, the district court improperly discounted Simeoneau's information. Simoneau, who at the time was believed to be a participant in the crime at issue, gave the information to Customs Agents face-to-face after he was apprehended with 142 pounds of marijuana, circumstances that ordinarily would suggest reliability.[4] *See,*

---

4. At oral argument, the Government stated that at the time Simoneau was detained at the border, the Agents did not believe him when he disavowed any knowledge of the 142 pounds of marijuana found in the truck he was driving. The Government explained, however, that further investigation led it to conclude that because Simoneau had been asked by Eric Gagnon's brother to drive the trailer down to Exit 21B and had not assisted

in the loading of the trailer, it was reasonable to believe Simoneau was unaware of the presence of the marijuana. Regardless of the Government's eventual conclusion that Simoneau was likely not a knowing participant in the crime and its decision not to charge him, at the time of Simoneau's arrest the Officers had a well-founded belief that Simoneau was a participant in the crime.

e.g., *Canfield,* 212 F.3d at 719; *Salazar,* 945 F.2d at 50–51; *Miller,* 925 F.2d at 699; *Jackson,* 560 F.2d at 121.

In addition, the information Simoneau provided was specific and it was corroborated, almost entirely, by the Officers prior to the search. For example, Simoneau told Customs Agents that he was to meet Eric Gagnon at the Fox Run truck stop at Exit 21B of the New York State Thruway—hundreds of miles away from the Port of Champlain where Simoneau was stopped—and that the trailer Gagnon would be towing would have Lanfort written on the side and would be empty. (GA 218.) Although not mentioned by the district court, Agent Harris testified that Customs Agents also reported that Simoneau said he was to meet Gagnon between 7:00 p.m. and 8:00 p.m. (GA 114.) Trooper Swan observed the tractor trailer with Lanfort on the trailer enter the Fox Run truck stop on April 4, 2002 at approximately 7:20 p.m., (*id.*) exactly as Simoneau had predicted.

Then, *after* Agent Harris called the United States Attorney's Office, additional information that was provided by Simoneau was corroborated by the Officers. Defendant confirmed that he was Eric Gagnon, a Canadian truck driver. (GA 219–20.) Also, the Officers confirmed that Gagnon was driving the only trailer in the parking lot that bore the name "Lanfort" on its side and that the trailer he was towing was empty. (GA 219–20.) Although a criminal informer may be less reliable than an innocent bystander, *Caldarola,* 298 F.3d at 163, and corroboration of innocent behavior may be less dispositive than corroboration of criminal activity, *see Pena,* 961 F.2d at 339, Simoneau's information was corroborated by the Officers in all material respects, and, considering the totality of the circumstances, his

entire account may be credited, *Gates,* 462 U.S. at 237–238, 103 S.Ct. 2317; *Canfield,* 212 F.3d at 719–20; *Wagner,* 989 F.2d at 73. Because the numerous details provided by Simoneau were corroborated, that information should have been credited despite the fact that, as the district court stated, "the law enforcement agents had no experience upon which to base the credibility of Simoneau's information." (GA 214). *Gates,* 462 U.S. at 244, 103 S.Ct. 2317. Thus, the district court erred in considering only Gagnon's "[m]ere presence at a New York State Thruway exit with a certain type of vehicle," (GA 214–15), in failing to recognize the extent to which the information Simoneau provided was corroborated as the evening progressed and by failing to consider that information in its probable cause determination.

B. **The District Court Improperly Concluded that the Defendant Did Not Deny Knowing Simoneau and Was Not Evasive**

■ In the July 23 Order finding no probable cause, the district court found that "defendant was not evasive or inconsistent in his answers to the agents' inquiry" at the truck stop. (GA 214.) In the November 6 Order, the district court found:

Miserendino asked Gagnon if he knew a 'Daniel Simoneau.' (Tr., p. 23). Upon hearing the name 'Daniel,' but not together with the name 'Gagnon,' Gagnon responded 'Daniel Gagnon, my brother I know.' (Tr., p. 187). Miserendino then continued to ask Gagnon if he knew Simoneau and Gagnon continued to respond that Daniel Gagnon was his brother. (Tr., p. 23).

(GA 220.)

The following testimony by defendant Gagnon on direct examination at the suppression hearing is relevant on this issue:

Q: "All right. Now, after this conversation [with the Officers] about whether you knew this Daniel Simoneau, what happened next?"

A: "Okay. I said to them—after that, I said—they asked me again. And I said no, I don't know Daniel Simoneau; I know Daniel, it's [sic] my brother."

(GA 168.) Also relevant is the following testimony by defendant Gagnon on cross examination:

MR. MORENO: Ask him if he understood that the sergeant asked him if he knew someone by the name of Daniel Simoneau back on the day that he was talking to the sergeant.

A: Yes.

Q: Okay. And you said no?

A: No, I said no, no, I said no, I know a George Gagnon, he's my brother.

MR. MORENO: Did he say George or Daniel, ma'am?

INTERPRETER BARRETT: I'm sorry. I got that wrong. Daniel Gagnon. Excuse me.

(GA 186.) Indeed, on appeal, the defendant admits that he denied knowing Simoneau when questioned by the Officers: "Gagnon said that the only Daniel he knew was Daniel Gagnon, his brother and did not know a 'Daniel' Simoneau." (Defendant's Brief at 6–7.) "He correctly identified himself and said that the only Daniel he knew was his brother, who is named Daniel." (Defendant's Brief at 16.)

Accordingly, the district court's conclusion that the defendant did not deny knowing Simoneau and, thus, its finding that Gagnon was not evasive in responding to the agents' questions were clearly erroneous.

C. The District Court Improperly Included in its Probable Cause Determination the Probable Cause Determination of the Assistant United States Attorney

■ In its November 6 Order, the district court noted that the automobile exception did not apply and added:

In addition, the United States Attorney's Office itself told Harris that the officers did not have probable cause to search the cab without a warrant, or probable cause to get a warrant in the first place (Tr., pp. 117–18, 136). This exception, thus, does not apply.

(GA 227–228 n. 13.) The district court's consideration of the Assistant United States Attorney's subjective view of the presence or absence of probable cause, however, was error.

First, the record does not disclose what facts were related to the Assistant United States Attorney upon which his view about probable cause was based. Thus, there is no way to judge the reliability of the Assistant's view.

Second, the inquiry was made prior to the Officers' encounter with Gagnon. Thus, the factual recitation could not have included Gagnon's false denial of knowing Simoneau, a fact that, as we have held above, is significant.

■ Finally, a law enforcement officer's mistaken belief that probable cause did not exist at the time is irrelevant to a court's later determination of whether probable cause existed at the time. *See Florida v. Royer*, 460 U.S. 491, 507, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality) ("[T]he fact that the officers did not believe there was probable cause ... would not foreclose the State from justifying Royer's custody by proving probable cause."); *United States v. Treto–Haro*, 287 F.3d 1000, 1006 (10th Cir.2002); *United*

*States v. Santana–Garcia,* 264 F.3d 1188, 1192 (10th Cir.2001).

Accordingly, the district court erred by including in its determination of probable cause the determination of the Assistant United States Attorney made prior to the Officers' contact with the defendant.

D. The District Court Failed to Consider the Totality of the Circumstances within the Officers' Knowledge Prior to the Search of the Defendant's Tractor Trailer

█ As we have held above, the district court failed to consider certain relevant facts and improperly considered other facts in making its determination that probable cause did not exist to search Gagnon's truck. Because we review that determination *de novo, Joyner,* 201 F.3d at 74, we now consider the totality of the circumstances before the district court. Accordingly, we consider whether the Officers had sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense was being committed by Gagnon and, more specifically, whether there was a "fair probability that contraband or evidence of a crime," *Massachusetts v. Upton,* 466 U.S. 727, 733, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984) (quoting *Gates,* 462 U.S. at 238, 103 S.Ct. 2317), would be found in the cab of his tractor trailer and the blue duffel bag therein.

Here, Simoneau had been detained at the Port of Champlain driving a truck containing 142 pounds of marijuana. He told the Customs Agents that he was driving to meet Eric Gagnon at the Fox Run truck stop at Exit 21B of the New York State Thruway between 7:00 and 8:00 p.m. to exchange trailers with Gagnon. He also told Agents that Gagnon would be driving a tractor trailer with "Lanfort" on the side and that the trailer would be empty. Si-

moneau, reasonably believed to be a participant in the crime under investigation, provided this information in a face-to-face encounter, and the information was shown to be reliable when the Officers observed a Lanfort tractor trailer pull into the Fox Run truck stop at Exit 21 B on the Thruway between 7:00 and 8:00 P.M. Eric Gagnon was confirmed to be the driver of the tractor trailer, which was the only Lanfort trailer in the lot and was found to be empty. Not only was all of Simoneau's information confirmed in every detail, thus increasing reliability, but the officers had additional reason to suspect that Gagnon was involved in an illegal enterprise when he falsely denied knowing Simoneau. On these facts, probable cause existed to believe that Gagnon was committing a crime and that evidence thereof, whether drugs, money or drug records, would be found in the cab of the truck described by Simoneau or in the blue duffle bag therein.

## CONCLUSION

We find that probable cause existed to search the cab of the defendant's tractor trailer and the blue duffel bag therein. Accordingly, the district court's order suppressing the $305,000 in currency seized during the search is reversed, and the case is remanded for trial.