**UNITED STATES of America,**

v.

**Ronald ZIMMERMAN, Defendant.**

No. 5:14–CR–416.

United States District Court,
N.D. New York.

Signed Feb. 17, 2015.

Richard S. Hartunian, United States Attorney for the Northern District of New York, Syracuse, NY, of counsel Nicolas Commandeur, Esq., Ass't United States Attorney.

Lisa Peebles, Federal Public Defender for the Districts of Northern New York and Vermont, Syracuse, NY, of counsel Randi Juda Bianco, Esq., Ass't Public Defender, Attorneys for Defendant.

### MEMORANDUM–DECISION and ORDER

DAVID N. HURD, District Judge.

## I. INTRODUCTION

. On November 13, 2014, a federal grand jury returned a one-count indictment

charging defendant Ronald Zimmerman ("Zimmerman" or "defendant") as a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). Defendant now moves pursuant to Federal Rule of Criminal Procedure 12(b) to suppress the firearm in question, along with related evidence recovered from a search of his wife's vehicle and a later consent search of their shared residence, as the fruit of an unlawful traffic stop. The United States of America (the "Government") opposes. Defendant submitted a reply. Oral argument was heard in Utica, New York on February 12, 2015. Decision was reserved.

## II. BACKGROUND [1]

On September 29, 2014, at about eight o'clock in the morning, Syracuse Police Officer Tracy Greco ("Officer Greco") was interviewing a woman at 117 Albert Terrace in the City of Syracuse when she overheard the "distinct popping noise" of a gunshot just north of her location. Greco Aff., ECF No. 17–2, ¶ 2.

Officer Greco notified radio dispatch about what she had just heard and then drove her vehicle toward the sound's origin: Jimmy's Super Saver, a grocery store located at the corner of South State Street and East Raynor Avenue, about one-half block away. Greco Aff. ¶¶ 2–3. Once there, Officer Greco spoke to an individual in the parking lot who confirmed that he, too, had heard a gunshot, but believed it had come from the South Side Car Wash, located about fifty yards away. Id. ¶¶ 4–5.

Officer Greco then drove to the South Side Car Wash's parking lot, where she observed two vehicles—a parked maroon van and a white Volkswagen sedan that was preparing to leave. Greco Aff. ¶ 5.

She situated her police cruiser alongside the van, flagged down the sedan before it drove away, and then questioned the occupants of both vehicles about whether they had heard the gunshot. Id. ¶¶ 5–6.

The passenger of the white Volkswagen, a black male later identified as Zimmerman, leaned across to the driver's window and indicated that he had not heard anything. Greco Aff. ¶ 6. The driver of the white Volkswagen, a black female later identified as Barbara Zimmerman, shook her head to indicate that "she also heard nothing." Id. However, a third individual—a black male who had been wiping down the exterior of the maroon van—admitted to hearing a "noise" that he believed came from the grocery store. Id. ¶ 6.

At this point, Syracuse Police Department Detective James O'Brien ("Detective O'Brien") arrived on-scene to assist Officer Greco's investigation. Greco Aff. ¶ 7; O'Brien Aff., ECF No. 17–1, ¶¶ 2–3. Officer Greco brought Detective O'Brien up to speed on what her investigation had revealed so far, then she walked to Mondo's Gas Station, located on the same property as the car wash, to search for other witnesses while Detective O'Brien swept the surrounding area on foot. Greco Aff. ¶ 7; O'Brien Aff. ¶ 4.

When Officer Greco arrived at the gas station, she spoke to Peter Mondo, the gas station owner's brother. Greco Aff. ¶ 8. Mr. Mondo confirmed that he and some other patrons had also heard a popping noise. Id. Although he initially believed it to be "just a blown tire," he informed Officer Greco that he, too, believed it to be the sound of a gunshot once he determined

---

**1.** Neither party has requested an evidentiary hearing and the facts relevant to the search are not in dispute. *United States v. Billups,* 181 Fed.Appx. 79, 82 (2d Cir.2006) (summary order) ("An evidentiary hearing is only required where 'contested issues of fact going to the validity of the search are in question.'" (citation omitted)).

that no one was attempting to fill a tire with compressed air. *See id.*

Having found no smoking gun, Officer Greco and Detective O'Brien returned to their respective vehicles, which had remained parked at the car wash. Greco Aff. ¶ 9; O'Brien Aff. ¶ 4. By this time, the white Volkswagen carrying the Zimmermans had left the area. *Id.* However, the maroon van remained parked in the lot and one of its occupants, the black male who had been wiping down the van earlier (the "eyewitness"), approached Officer Greco. *Id.*

This eyewitness informed Officer Greco that he had been in the car wash parking lot when he heard a gunshot come from the white Volkswagen parked nearby. Greco Aff. ¶ 9. He further stated that he believed the black male occupant of that car had discharged the weapon when he was attempting to exit the vehicle.[2] *Id.* The eyewitness also stated "GHD–1463" and that "[y]ou owe me, Greco," just before walking away. *Id.*

Officer Greco believed the eyewitness had given her the license plate number of the white Volkswagen he had just identified as the source of the gunshot. Greco Aff. ¶ 11. She conducted a registration database search of this number, which revealed that it belonged to a white 2002 Volkswagen Passat sedan registered to Barbara A. Zimmerman at 1207 Almond Street, Apt. 1301, the address of a nearby apartment complex. *Id.*

Officer Greco updated radio dispatch with this additional information and advised that the black male passenger she had observed earlier (and man the eyewitness had just identified as a passenger in the white Volkswagen) was an older black

male "wearing a black baseball hat and glasses." Greco Aff. ¶ 11.

Both Officer Greco and Detective O'Brien then headed to Barbara Zimmerman's address in separate police vehicles. Greco Aff. ¶ 12; O'Brien Aff. ¶ 7. Officer Greco arrived first and reported to dispatch that the white Volkswagen was not in the apartment complex's parking lot. Greco Aff. ¶ 12. Detective O'Brien, who had taken a slightly different route to the address, observed the white Volkswagen driving just past the exit to this parking lot. O'Brien Aff. ¶ 8.

Detective O'Brien pursued the white Volkswagen down the street, confirmed that the license plate numbers matched the eyewitness's statement, and executed a motor vehicle stop. O'Brien Aff. ¶ 8. He approached the white Volkswagen with his service weapon drawn, walked around to the vehicle's passenger side, and ordered both passengers to raise their hands. *Id.*

By this time, other police units, including Officer Greco, arrived on scene. *Id.*; Greco Aff. ¶ 13. Officer Greco removed Zimmerman from the front passenger seat, ordered him to the ground, placed him in handcuffs, and seated him by the roadside. Greco Aff. ¶ 13. Barbara Zimmerman, the white Volkswagen's owner, was removed from the driver's seat and placed in the back seat of Detective O'Brien's car, but was not handcuffed. *Id.*; O'Brien Aff. ¶ 9.

Both Zimmerman and his wife were searched, but no weapons or other contraband were found on their persons. Greco Aff. ¶ 13; O'Brien Aff. ¶ 10. However, a search of the white Volkswagen revealed a live round of .38 caliber ammunition on the passenger side compartment's rear floor-

---

2. Both Officer Greco and Detective O'Brien identified this witness in their respective police reports as "an individual who wished to remain anonymous" because individuals in high-crime neighborhoods, such as the one at issue here, fear retribution for assisting the police. Greco Aff. ¶ 10; O'Brien Aff. ¶ 5.

board. O'Brien Aff. ¶ 10.[3] The Zimmermans were then transported to the Syracuse police station for further questioning. Greco Aff. ¶ 15; O'Brien Aff. ¶ 11.

In the meantime, Detective O'Brien suspected Zimmerman had returned to his apartment to hide the firearm following his encounter with Officer Greco at the car wash. O'Brien Aff. ¶ 11. Detective O'Brien spoke with a front desk employee at the apartment complex, who confirmed Zimmerman had recently entered the apartment. *Id.* Detective O'Brien also obtained security footage and key fob records confirming that Zimmerman had entered the building just after his encounter with Officer Greco that morning. *Id.* ¶¶ 11–13.

After gathering this evidence, Detective O'Brien returned to the police station and interviewed Zimmerman, who waived his *Miranda* rights. O'Brien Aff. ¶ 14. Detective O'Brien outlined the details of his investigation so far and told Zimmerman he intended to apply for a search warrant for his apartment. *Id.* ¶ 15. Zimmerman said that would not be necessary—he admitted to possessing a .38 caliber handgun for self-defense, explained that it had accidentally discharged at the car wash that morning, and confirmed that he had returned the firearm to his apartment before being stopped by police. *Id.* ¶¶ 15–16. Zimmerman then explained to Detective O'Brien where the handgun was located in his apartment and gave consent to enter the apartment and retrieve the weapon. O'Brien Aff. ¶ 16.

Shortly after Zimmerman confessed, Syracuse Police Department Detective Edward MacBlane ("Detective MacBlane") met with Barbara Zimmerman, who had been seated in the public hallway of the police station during her husband's interrogation. MacBlane Aff., ECF No. 17–3, ¶¶ 3–4. Detective MacBlane explained to Mrs. Zimmerman that her husband had already confessed and that she was free to go. *Id.* ¶ 5. However, she nevertheless agreed to provide a written statement about the firearm as well as consent to search the apartment. *Id.*

After speaking with her husband privately, Mrs. Zimmerman allowed herself to be escorted by Detective O'Brien and an evidence technician to her apartment to retrieve the firearm and several rounds of ammunition. *Id.* Zimmerman was arrested and charged with Criminal Possession of a Weapon in the Second Degree. Greco Aff. ¶ 17.

## III. DISCUSSION

### 1. Motion to Suppress [4]

Zimmerman argues law enforcement lacked probable cause to arrest him and search his wife's vehicle. Def.'s Mem. 6. Specifically, defendant contends that this unlawful stop necessitates that all "evidence obtained from that search and any and all fruit derived from that search, including any and all statements attributed to both [Zimmerman and his wife] (including any consent) and the evidence seized as a result of those statements" must be suppressed. *Id.* at 6–7.

---

3. Zimmerman's affidavit states that he was placed in the back of a police car before the vehicle search occurred. ' Zimmerman Aff., ECF No. 13–2, ¶ 5.

4. Zimmerman devotes much of his supporting affidavits to establishing standing to challenge the search of his wife's vehicle. However, the Government does not raise this issue in opposition. Therefore, defendant's standing to assert this challenge is assumed for purposes of this motion.

The Government responds that: (1) police had probable cause to arrest defendant at the time of the traffic stop; (2) even assuming otherwise, police were still entitled to conduct an investigatory *Terry* stop and a protective sweep of the car; and (3) in any event, Mrs. Zimmerman's written consent constitutes an independent justification for the search of the apartment that led to discovery of the firearm and additional rounds of ammunition. Gov. Mem. 10, 19.

### A. *Arrest*

"While reasonable suspicion of criminal activity may justify a brief investigative detention, an arrest violates the Fourth Amendment if it is not supported by probable cause." *United States v. Campbell,* 790 F.Supp.2d 166, 173 (D.Vt.2011) (internal citations omitted). Zimmerman contends he was placed under arrest at the beginning of the vehicle stop. The Government, while reluctant to concede that law enforcement did anything more than conduct an investigative detention and protective sweep of the vehicle, argues that the seizure is supported by probable cause.

■ "In determining whether a particular restraint is an arrest or tantamount to an arrest, thus requiring probable cause, or instead is a restraint short of an arrest, thus calling for an analysis under a reasonableness standard, the degree of restraint must be analyzed." *Campbell,* 790 F.Supp.2d at 174 (quoting *United States v. Marin,* 669 F.2d 73, 81 (2d Cir.1982)). "In particular, courts have considered the amount of force used by the police, the extent of the intrusion, and the extent to which the individual's freedom of movement is restrained." *Id.*

■ Here, the record demonstrates that Zimmerman was subjected to a full arrest. When Detective O'Brien initially executed the vehicle stop, he drew his service weap-

on and ordered both passengers to raise their hands. O'Brien Aff. ¶ 8. Officer Greco then removed defendant from the front passenger seat, ordered him to the ground, and placed him in handcuffs. Greco Aff. ¶ 13. Likewise, Barbara Zimmerman was removed from the driver's seat and placed in the back seat of Detective O'Brien's car. O'Brien Aff. ¶ 9. Under these circumstances, the officers' display of force and restraint amounted to a full arrest. *See, e.g., United States v. Mayberry,* No. 2:12–cr–153, 2013 WL 3560968 (D.Vt. July 11, 2013) (concluding vehicle occupants were subjected to "a full arrest" when officers pulled vehicle over, drew weapons, ordered occupants out of vehicle, handcuffed them, and searched their persons).

### B. *Probable Cause*

■ "Probable cause exists if a law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Martinez,* 992 F.Supp.2d 322, 328 (S.D.N.Y. 2014) (quoting *United States v. Gagnon,* 373 F.3d 230, 236 (2d Cir.2004)). "The Supreme Court and the Second Circuit have emphasized that the probable cause analysis is a commonsense, non-technical inquiry, based on the totality of the circumstances rather than on the satisfaction of discrete criteria." *Id.* (citations omitted).

First, Zimmerman claims his warrantless arrest was impermissible because the eyewitness "did not even report witnessing a felonious act." Def.'s Reply Mem. 3 n. 3. In particular, defendant contends that N.Y. Penal Law § 265.03, the criminal statute under which he was charged and which the Government identifies as

relevant here, requires "intent to use the firearm unlawfully against another." Defendant claims this statute is inapplicable because the eyewitness reported only "an accidental shot fired with no apparent victim and no apparent property damage." *Id.*

But this is simply a misreading of that statute. Although § 265.03(1)(a)-(c) requires intent, the remaining provisions of that section, including the one under which Zimmerman was charged, do not. *See* N.Y. Penal Law § 265.03(3) (making it a class C felony to "possess[ ] any loaded firearm"); *People v. White,* 75 A.D.3d 109, 120, 901 N.Y.S.2d 346 (N.Y.App.Div.2d Dep't 2010) ("Under New York's statutory scheme, the possession of an unlicensed loaded firearm is a violent felony, unless the defendant possesses the weapon in his or her home or place of business.").

■ Here, Officer Greco could fairly infer there was a loaded firearm in the vicinity—she personally heard a "distinct popping noise," which, based on her law enforcement experience, was the sound of a firearm discharging its ammunition; other witnesses had heard a similar sound in the same area; so-called "innocent" explanations, such as the noise of a popping tire, had been excluded by her initial investigation; and the eyewitness had informed her the gunshot had come from the white Volkswagen.

The only apparent foible (and one not raised by Zimmerman here) is that § 265.03(3) only criminalizes "unlicensed" firearm possession. However, given Officer Greco's law enforcement experience and that: (1) the gunshot occurred in a "high-crime neighborhood"; (2) in a public parking lot; (3) defendant denied even hearing a gunshot; (4) defendant failed to initially inform her about the weapon or show his license to carry same, this was sufficient information to enable a reason-ably cautious person to believe the felony at issue—the unlawful possession of a loaded firearm—was being committed. *See Illinois v. Gates,* 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (noting that probable cause deals with "probabilities," not "hard certainties"); *see also United States v. Delossantos,* 536 F.3d 155, 161 (2d Cir.2008) (noting that, despite possible innocent explanations, a court "must evaluate the facts in light of the training and experience of the arresting agents").

Next, Zimmerman argues that his "mere presence in the vicinity of a gunshot" is insufficient to establish probable cause and that, in reality, the officer's probable cause determination is based solely on a tip from the unidentified informant. The Government responds that this argument ignores Officer Greco's additional investigative efforts as well the fact that she had a face-to-face opportunity to assess the eyewitness at the time he made his report.

■ "Probable cause may be based on a tip from a confidential or anonymous informant, provided that the tip is sufficiently reliable." *United States v. Herron,* 18 F.Supp.3d 214, 225 (E.D.N.Y.2014); *see also United States v. Elmore,* 482 F.3d 172, 180 (2d Cir.2007) ("Under the totality of the circumstances approach ..., even a completely anonymous tip could support a finding of probable cause with a sufficient degree of corroboration."). "Where an informant's statements form the basis of a law enforcement officer's assessment of probable cause, the informant's 'veracity, reliability and basis of knowledge' are among several relevant considerations to be balanced, as is the extent to which the informant's statements are corroborated by independent police work." *United States v. Johnson,* No. S2 10 Cr. 431(CM), 2013 WL 150107, at *4 (S.D.N.Y. Jan. 10, 2013) (citing *Gates,* 462 U.S. at 241–42, 103

S.Ct. 2317). Finally, a "face-to-face informant ... must be thought more reliable than an anonymous telephone tipster, for the former runs the greater risk that he may be held accountable if his information proves false." *Id.* (quoting *United States v. Salazar*, 945 F.2d 47, 50–51 (2d Cir. 1991)).

Here, the eyewitness in question chose to wait in the area of his own accord, voluntarily approached law enforcement to provide his account of events face-to-face, and indicated that he knew Officer Greco by name, even if she did not recognize him. These circumstances gave Officer Greco a sufficient opportunity to confirm that he was the same individual who had been present when she initially arrived at the car wash. It also enabled her to assess his "veracity, reliability, and basis of knowledge" by comparing his proffered information to the results of the investigation she had independently conducted to that point.

In reply, Zimmerman claims that the eyewitness should be discredited because he chose to wait until the white Volkswagen left the area before speaking with law enforcement. But an eyewitness can hardly be faulted for waiting until someone who just discharged a firearm in a car wash parking lot had left the area before feeling safe enough to report it to police.

Zimmerman also contends that the eyewitness's statement that "[y]ou owe me, Greco" actually undermines his credibility because it suggests that he is involved in "some criminal dealings" and sought to curry favor from law enforcement. But the fact that the eyewitness referred to Officer Greco by name could fairly indicate that he did not believe his report to be fully "anonymous" and free from repercussions. Rather, it suggests he believed that

law enforcement could, if so inclined, track him down and charge him appropriately if his report were false.[5]

In any event, and as the Government correctly argues, the eyewitness's statement was just one part of a larger investigative puzzle. By the time Detective O'Brien effected the traffic stop, both officers' independent investigation into the noise, occurring both before and after the eyewitness approached Officer Greco to offer his information, tended to corroborate the eyewitness's account. In particular: (1) Officer Greco had heard a sound she believed to be a gunshot less than a block away; (2) when she arrived, she spoke to multiple eyewitnesses at several locations who had also heard a gunshot in the area; (3) only two vehicles—the maroon van and the white Volkswagen—were located at one of the most likely sources of the sound; (4) other explanations for the noise, such as a popping tire, had been excluded; (5) the eyewitness chose to wait in the area and deliver his account face-to-face; (6) the license plate number and description of Zimmerman offered by the eyewitness was consistent with Officer Greco's initial observations; and (7) Officer Greco was on the scene of the traffic stop before the Zimmermans were removed from the white Volkswagen and could further confirm that the individual identified by the eyewitness was the same as the one with whom she had spoken to earlier in her investigation. In sum, the eyewitness's face-to-face statement, combined with the additional information gathered by law enforcement that corroborated his account and excluded alternative explanations, established probable cause for arrest at the time of the traffic stop.

---

5. Indeed, even accepting Zimmerman's argument that the eyewitness somehow sought to curry favor, it would require law enforcement to be able to identify the eyewitness or else any accrued "goodwill" would be meaningless.

■ Finally, Zimmerman argues in a footnote that the "search incident to arrest exception" could not be used to search the vehicle because neither Zimmerman nor his wife were in a position to reach into the vehicle at the time the search occurred. But this argument misstates controlling Supreme Court precedent. Specifically, *Arizona v. Gant* authorizes an automobile search incident to the arrest of an occupant even after the arrestee has been secured and can no longer access the interior of the vehicle as long as "it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle." 556 U.S. 332, 335, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009).

■ Here, law enforcement officers were seeking an individual who had just discharged a firearm in a public space before leaving the area in a vehicle. There was a fair probability that the firearm and/or ammunition might be found in that same vehicle, especially since it was not found during a search of Zimmerman's person. *See United States v. Gonzalez,* 441 Fed.Appx. 31, 33–34 (2d Cir.2011) (summary order) (noting there was "fair probability" firearms would be found in vehicle where informant's tip suggested they would be present, but none were located during search of arrestee's person). Accordingly, Zimmerman's motion to suppress will be denied.

### 2. *Motion to Dismiss the Indictment*

Zimmerman also argues for dismissal of the indictment against him because § 922(g)(1)'s prohibition on the possession of firearms by convicted felons is a violation of his Second Amendment right to bear arms, especially for purposes of self-defense. But, and as Zimmerman's counsel concedes, the Second Circuit has already squarely rejected such an argument. *United States v. Bogle,* 717 F.3d 281 (2d Cir.2013) (per curiam) ("[Section] 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons." (footnote omitted)). Accordingly, Zimmerman's motion to dismiss the indictment will also be denied.

### IV. *CONCLUSION*

Zimmerman's entire suppression argument rests on the eyewitness's failure to identify himself and law enforcement's concomitant failure to make certain he could be held accountable for a false report. But this ignores the indicia of reliability surrounding the eyewitness's account as well as the relatively thorough investigation independently completed by the officers that occurred prior to the traffic stop and arrest.

Therefore, it is

ORDERED that

Defendant Ronald Zimmerman's motion to suppress evidence and dismiss the indictment is DENIED.

IT IS SO ORDERED.