[901 NYS2d 346]

The People of the State of New York, Respondent, v John White, Appellant.

Second Department, May 18, 2010

APPEARANCES OF COUNSEL

*Mischel & Horn, P.C.*, New York City (*Richard E. Mischel* and *Lisa Marlow Wolland* of counsel), for appellant.

*Thomas J. Spota, District Attorney*, Riverhead (*Thomas C. Costello* and *Marion M. Tang* of counsel), for respondent.

### OPINION OF THE COURT

ENG, J.

On the night of August 9, 2006 the 53-year-old defendant shot and killed 17-year-old Daniel Cicciaro, Jr. The shooting occurred at the edge of the driveway of the defendant's home in Miller Place, New York. It is undisputed that the victim was part of a group of five teenagers who had driven to the defendant's home to confront the defendant's son about a threat he had allegedly made against a 14-year-old girl. However, sharply conflicting evidence was presented during the course of a lengthy jury trial regarding the events leading up to the shooting, the manner in which the shooting occurred, and whether

race played any role in the encounter between the white youths and the African-American defendant. At the conclusion of the trial, the jury convicted the defendant of manslaughter in the second degree and criminal possession of a weapon in the third degree. The defendant now appeals, contending, among other things, that his conviction of manslaughter in the second degree was against the weight of the evidence because the shooting was justified in defense of his premises. The defendant also challenges the legal sufficiency of the evidence presented to establish his guilt of criminal possession of a weapon in the third degree, and raises several challenges to the trial court's evidentiary rulings and the propriety of its instructions to the jury.

At trial, the People's case relied heavily upon the testimony of the four young men who accompanied the victim to the defendant's home on the night of the shooting. These witnesses, Anthony Simeone, Thomas Maloney, Joseph Serrano, and Alex Delgado, all testified that on the night of August 8, 2006 they attended a 19th birthday party for Craig Martin, Jr., at which some of the guests, including the 17-year-old victim, consumed alcohol. The defendant's 19-year-old son Aaron arrived at the party at about 10:00 P.M., accompanied by a friend. However, Aaron was asked to leave the party because allegedly he had posted an Internet threat to sexually assault Martin's younger sister Jenny about eight months earlier, and she was uncomfortable with his presence. The alleged threat was made through a fake MySpace page which two of Aaron's friends had created as a prank. When Jenny told the victim about the threat, he became angry because she was "like a little sister to him," and called Aaron on his cell phone to argue with him. After a second angry telephone call, the victim announced to his friends that Aaron had told him to "come to his house and fight him." The victim left the party, got into a car driven by his friend Delgado, and asked Delgado to take him to Aaron's house. Simeone, Serrano, and Maloney followed in a second vehicle, allegedly intending to stop the victim, who was intoxicated, from fighting with Aaron. Prior to entering Maloney's car, Serrano grabbed a baseball bat, which he threw onto the back seat. After the victim apparently obtained directions from Aaron, the two cars carrying the five teenagers arrived at the cul-de-sac where the defendant's home was located shortly after 11:00 P.M. They parked on the street near the end of the cul-de-sac, leaving both cars running with their lights on, but facing away from the driveway of the defendant's home. The youths exited the cars unarmed, leaving the bat inside Maloney's vehicle. The group was stand-

ing in the street just in front of the apron of the defendant's driveway when the defendant and Aaron emerged from the garage, and walked down the driveway with their hands behind their backs. As they approached, Aaron pulled out a long rifle, and the defendant pulled out a black handgun.

A verbal altercation ensued, with yelling back and forth and the exchange of curses. Although the teenagers denied stepping onto the defendant's driveway, he shouted at them to get off his property, and "leave, leave." The victim demanded that Aaron step away from the property so they could fight. When Aaron began exchanging words with Maloney, the defendant lifted his gun and pointed it at Maloney's head. Seeing the weapon pointed at his friend, the victim screamed at the defendant to "put the gun down," and stepped onto the driveway. After a further exchange of curses, the defendant told the victim that "if you don't get out of here, I'm going to shoot you." The victim countered, "if you're going to shoot me, shoot me." The defendant then pointed the gun at the victim, bringing it just a few inches away from the victim's face. The victim backed up, and slapped the gun away with his right hand. However, the defendant brought the gun back up, and shot the victim in the face. While the victim's friends denied using racial slurs during the incident, in a tape-recorded 911 call, one of the youths can be heard shouting racial slurs as he vows to avenge the victim.

The People's case also included the testimony of a forensic scientist, who examined the .32 caliber Beretta handgun used to shoot the victim, and concluded that it required 9.5 to 10 pounds of force to fire, which he characterized as a "medium to heavy" trigger pull. Over defense counsel's objections, the forensic scientist was permitted to testify regarding other weapons, ammunition, and related paraphernalia recovered from the defendant's home. These weapons included several rifles and a shotgun. The forensic scientist also examined the crime scene after the shooting, observing a bloodstain on the apron of the defendant's driveway, and a second bloodstain in the street. According to the measurements he took during his examination, the distance from the defendant's garage to the edge of his driveway where the roadway began was 65 feet, and the distance from the defendant's front door to the edge of the driveway was 81 feet.

In addition, the People presented testimony from two other expert witnesses, who concluded, based upon the presence of stippling and soot on the victim's cheek, that the Beretta had been fired from close range.

In contrast, the defense witnesses maintained that the victim and his friends came to the defendant's home planning to harm Aaron, and that the young men repeatedly uttered racial slurs. Aaron testified that after being asked to leave the birthday party, he received a call on his cell phone from the victim, who demanded that he return so that the victim could "kick . . . [his] ass." The victim's anger stemmed from the "bogus comment" about Jenny which had been posted through the fake MySpace account, and was so intense that Aaron believed that the victim would beat him up or even kill him. After reaching his home and parking, Aaron received a phone call from a friend warning him not to return to the party because there were "10 guys waiting" to fight him. While still on the phone, Aaron saw a vehicle which he believed belonged to Delgado driving down the block. Afraid that the victim and the victim's friends "were going to come to [his] house" to get him, Aaron went inside and woke up the defendant, yelling "Dad, these guys are coming here to kill me." Aaron then received a second phone call from the victim, peppered with curses and racial epithets, threatening to be at Aaron's house within minutes. Looking outside, Aaron saw two people exiting from the vehicle he believed was owned by Delgado, and a second vehicle parked, facing the driveway, with its headlights on. He then received another call from the victim, which he placed on speaker phone for his parents to hear, demanding that he come out of the house, and stating that the victim was there to kill him. Aaron admitted that he picked up what he thought to be an unloaded shotgun in order to scare the young men gathered outside his home, and that his father picked up a small pistol. After picking up the pistol, the defendant opened the garage door and ran outside, with Aaron following him. At the apron of the driveway, the victim and his friends engaged in a verbal argument, while the defendant ordered the youths to go home and get off his property. The defendant then told Aaron to go back to the house, and turned completely around to return inside himself. According to Aaron, it was at this point that the victim made "a crouching movement" and then rushed up behind the defendant, "like, trying to grab for something." The defendant turned around, there was a struggle, and the gun went off. The victim collapsed to the ground, with his body falling into the street.

Taking the stand to testify in his own behalf, the defendant related incidents of racial discrimination he had endured as a child, and claimed that, according to his grandfather, two family

members had been killed by the Ku Klux Klan in 1924. On the night of the shooting, he was roused from sleep by Aaron, who was saying, with "absolute terror" in his voice, "Pop, get up. These people are coming to try to kill me." After looking out of his bedroom window and seeing a car either heading into the cul-de-sac or already stopped at the mailbox in front of his home, the defendant grabbed his grandfather's shotgun from his bedroom closet, loaded it with a shot shell, and then dressed. At this point, the defendant looked out again, and saw a second vehicle pull up facing his driveway, with its lights pointed at his house. The defendant ran downstairs, and saw from a window on the first floor that four or five people were walking up his driveway. He then removed the shell he had loaded into the shotgun and placed that weapon in a closet, feeling both uncertain that the shotgun would work because of its age, and concerned that it might be "too much fire power to go into the street with." After shouting out to his wife to "call the cops," the defendant entered his garage, where he retrieved his grandfather's .32 Beretta pistol from a shelf in his garage. The defendant stated that his intention in arming himself with the pistol was to diffuse a bad situation and to stop the teenagers from coming into his house and hurting his family.

When the defendant walked out of his garage, some of the youths were standing on his driveway, and some were standing on the grass. Although the young men were yelling, screaming, and threatening Aaron, the defendant admitted that they did not threaten him with a weapon, and he did not see a weapon in their hands. The defendant ordered the youths, who were cursing and using racial epithets, to back up and get off his property, and fanned the gun at a low level below their waists. After they backed up and quieted down, the defendant told Aaron to get back in the house. The defendant then turned his left shoulder halfway to the house, and began to back up. As the defendant was turning, the victim "popped up" at him and tried "to snatch the gun" from his "right side, over [his] shoulder." The defendant pulled the gun back, and it fired. The defendant insisted that he had not intended to shoot the victim, and that he perceived the teenagers as a "lynch mob" coming after his son.

The defense case also included testimony from the defendant's wife, who remained inside and witnessed the shooting from a second-floor widow. Sonia White testified that the arguing had died down, and the defendant had started to come back

toward the house when he turned abruptly and his hand started "flaring." She then heard a "pop," and saw someone fall to the ground. Although Sonia White told the jury that the manner in which the teenagers came to her house "posturing" and acting "as if they owned it" made her feel that they were acting like a "lynch mob," she admitted that she had not called 911 that night because "everything happened so fast." However, she acknowledged that she had called 911 in the past for various reasons on at least seven occasions.

At the defendant's request, the court charged the jury on the defense of justification in defense of premises (Penal Law § 35.20 [3]) as it pertained to the count of manslaughter in the second degree. However, the court denied the defendant's request for an emergency justification charge pursuant to Penal Law § 35.05 (2) as it related to the count of criminal possession of a weapon in the third degree. Following four days of deliberations, the jury convicted the defendant of both counts of the indictment.

On appeal, the defendant contends that the jury's rejection of his justification defense to manslaughter in the second degree was against the weight of the evidence because given the circumstances surrounding the shooting, and his own past experience, a reasonable person in his position would have believed that the five teenagers were attempting to enter his home to commit a burglary. The defendant additionally maintains that his manslaughter conviction was against the weight of the evidence because the evidence presented at trial did not establish that he caused the victim's death.

Turning first to the issue of justification, Penal Law § 35.20 (3) authorizes a person to use deadly physical force against another person if he or she reasonably believes that such force is necessary to prevent or terminate a burglary of his or her home (see Penal Law § 35.20 [3]; People v Cox, 92 NY2d 1002, 1004 [1998]; People v Godfrey, 80 NY2d 860, 862 [1992]). The legislative history underlying the enactment of this provision reflects an intent "to protect those individuals who suddenly find themselves the victim of an intrusion upon their premises by one bent on a criminal end" (People v Godfrey, 80 NY2d at 862). A determination of whether a defendant has a reasonable belief that deadly force is necessary to prevent or terminate a burglary requires the application of a reasonableness standard which has both objective and subjective elements (see People v Wesley, 76 NY2d 555, 559 [1990]; People v Goetz, 68 NY2d 96, 112 [1986]). "The critical focus must be placed on the particular

defendant and the circumstances actually confronting him at the time of the incident, and what a reasonable person in those circumstances and having defendant's background and experiences would conclude" (*People v Wesley*, 76 NY2d at 559).

■ In fulfilling our responsibility to conduct an independent review of the weight of the evidence (*see* CPL 470.15 [5]; *People v Danielson*, 9 NY3d 342, 348 [2007]), we nevertheless accord great deference to the jury's opportunity to view the witnesses, hear the testimony, and observe demeanor (*see People v Mateo*, 2 NY3d 383, 410 [2004], *cert denied* 542 US 946 [2004]). Upon reviewing the record here, we are satisfied that the rejection of the justification defense was not against the weight of the evidence. Although the defendant testified that before leaving his house he saw four or five people walking up his driveway, he also acknowledged that once he and Aaron were outside, the youths backed up toward the street. By all accounts, the fatal confrontation between the defendant and the victim took place at the edge of the defendant's driveway, at a distance measured by the People's expert to be 65 feet away from his garage, and 81 feet away from the front door of his home. The defendant admittedly observed no weapons in the hands of any of the teenagers who were cursing at and arguing with his son, and the unarmed teens could not have reached the garage door without first getting past the defendant, who was armed with a pistol, and Aaron, who was armed with a shotgun. In addition, Aaron testified that as the teenagers were pulling up to his home the victim called him and told him to come out and fight, and the victim's friends testified that during the course of the verbal dispute, the victim demanded that Aaron step away from his family's property and come into the street to fight. The victim's clearly expressed desire to fight Aaron outside undercuts the claim that the defendant reasonably believed that the youths were going to attempt to enter his home.

It also bears emphasis that the defendant had a clear alternative to confronting the youths gathered outside of his home, and that alternative was to call 911 for police assistance. In their testimony, both Aaron and the defendant claimed that as the defendant was heading into the garage to retrieve the Beretta pistol, he shouted out to his wife to "call the cops." Sonia White, however, testified that she did not call 911 "because everything happened so fast," even though she had called 911 for various reasons on at least seven prior occasions. Indeed, neither the defendant nor any other member of his family called 911 that

night, and the failure to do so is inconsistent with the defendant's assertion that the shooting was committed in defense of his home. Considering all of these circumstances, there is thus ample support for the jury's conclusion that a reasonable person in the defendant's position, and with his background and experiences, would not have believed that the use of deadly physical force was necessary to prevent the teenagers from unlawfully entering or attempting to enter his home to commit a crime, and that the shooting was thus not justified pursuant to Penal Law § 35.20 (3) (*see People v Scharpf*, 60 AD3d 1101 [2009]; *People v Webb*, 215 AD2d 610 [1995]; *People v Levy*, 186 AD2d 66 [1992]).

We note that while the defendant places great emphasis on his claim that Maloney's vehicle was parked facing his driveway, with its lights shining on his house, there was conflicting testimony as to the direction in which the Maloney vehicle was parked, and no physical evidence supported the defense claim that it was facing the driveway. In any event, even accepting the defendant's argument that parking the vehicle facing the driveway with its headlights shining upon the house was "an antagonistic, fear-inducing act," the jury's conclusion that deadly physical force was not justified in defense of the defendant's premises was not against the weight of the evidence given, inter alia, the uncontroverted proof that the shooting occurred at a considerable distance away from the defendant's home, and that no effort to secure police assistance was made.

█ Furthermore, we reject the defendant's contention that the manslaughter verdict was against the weight of the evidence because the People failed to prove that his act of bringing the loaded Beretta pistol onto his driveway caused the victim's death. In support of his position, the defendant submits that the victim's death was the result of an unforeseeable, intervening event—the victim's slapping or grabbing of the gun, which caused it to discharge. As we have noted, the jury was faced with divergent accounts of how the shooting occurred. According to the testimony of the victim's friends, when the defendant first pointed the gun inches away from the victim's face, the victim slapped it away. The defendant then brought the gun back up, and shot the victim in the face. The jury was entitled to credit this version of the shooting, which was consistent with the evidence that the victim was shot at very close range. Moreover, the description of the shooting offered by the victim's friends does not support the conclusion that the victim's act of

slapping the gun away resulted in its accidental discharge. Rather, the testimony of the victim's friends indicated that after the victim slapped the gun away, the defendant raised the gun back up to his face, and fired the weapon, which had a "medium to heavy" trigger pull.

In any event, given the defendant's conduct in brandishing a loaded gun in front of the youths, with his finger on the trigger and with no safety mechanism engaged, a determination that he caused the victim's death would not be against the weight of the evidence even if, as he claims, the gun accidentally discharged when the victim tried to grab it away from him (*see People v Rodriguez*, 144 AD2d 273, 274 [1988]; *People v Guarino*, 56 AD2d 638, 639 [1977]; *see also People v DaCosta*, 6 NY3d 181, 184 [2006]; *People v Krotoszynski*, 43 AD3d 450, 452 [2007]). Indeed, a significant factor which supports the conclusion that the defendant's conduct in introducing a loaded weapon into a highly charged situation recklessly caused the victim's death is the defendant's familiarity with weapons, as evidenced by his ownership of rifles, shotguns, and handguns. The defendant's testimony that he initially armed himself with a loaded shotgun but then decided that the firepower potential of the shotgun was too great to bring into the street further underscores his awareness of the risk of confronting the youths with a weapon.

We also find no merit to the defendant's related claim that the trial court's charge on manslaughter in the second degree, which conformed to the standard CJI instruction, was inadequate to convey the applicable legal standard on causation (*see* CJI2d[NY] Penal Law § 125.15 [1]; *People v Foss*, 267 AD2d 505, 510 [1999]).

The defendant further contends that his conviction of criminal possession of a weapon in the third degree is both unsupported by legally sufficient evidence, and against the weight of the evidence, because he possessed the weapon in his "home" as that term has been defined by decisional law. Under New York's statutory scheme, the possession of an unlicensed loaded firearm is a violent felony, unless the defendant possesses the weapon in his or her home or place of business. If the possession takes place in the defendant's home or place of business, and he or she has not previously been convicted of a crime, the possession is punishable as a misdemeanor (*see* Penal Law § 70.02 [1] [b]; § 265.03 [3]; § 265.01 [1]; § 265.02 [1]; *People v Powell*, 54 NY2d 524, 526 [1981]). On the date of the shooting,

the possession of a loaded firearm outside of a person's home or place of business constituted criminal possession of a weapon in the third degree, a class D violent felony under Penal Law § 265.02 (former [4]). This offense has now been elevated, pursuant to legislation enacted effective November 1, 2006, to a class C violent felony (*see* Penal Law § 265.03 [3]).

The Legislature's decision to impose a lesser degree of punishment on a person who possesses a loaded firearm in his or her home reflects a policy decision that possession of a weapon for the defense of one's home and family "is less reprehensible than possession for other purposes" (*People v Powell*, 54 NY2d at 526). However, article 265 of the Penal Law, which governs offenses against public safety, does not define the term "home," and thus the courts have been called upon to determine the extent to which areas outside the residence itself may be afforded equal sanctity. In so doing, the courts have balanced competing "public policy concerns which reflect the constitutional right of citizens to bear arms to defend their persons and homes" against the State's "strong policy to severely restrict possession of any firearm" (*People v Maniscalco*, 198 AD2d 378, 379 [1993]). The balance struck between these policy considerations has resulted in a narrow construction of the term "home" which encompasses only "a very limited area around the house" (*id.* at 379; *see People v Buckmire*, 237 AD2d 151 [1997]; *People v Tolbert*, 253 AD2d 832, 833 [1998]). As we explained in *Maniscalco*, "[i]f the purpose of having the firearm is to protect family and home, then the firearm should be readily accessible, in the immediate vicinity of the home" (*People v Maniscalco*, 198 AD2d at 379). Applying this rationale in *Maniscalco*, we found that the defendant's possession of a gun which the police retrieved from the storage console of his locked car, which was parked on the unfenced driveway of his residence, did not fall within the home exception. Taking into account that an important factor in determining the applicability of the home exception is whether "the possessor of the weapon was entitled to 'privacy, as one would have in his home' in the area where he was apprehended with the weapon" (*People v Powell*, 54 NY2d at 530), we also pointed out in *Maniscalco* that the defendant's driveway was "accessible to pedestrian traffic, [and] the public sidewalk crossed over a portion of the driveway" (*People v Maniscalco*, 198 AD2d at 378). Subsequently, in *People v Tolbert* (253 AD2d at 833), we rejected the defendant's attempt to distinguish *Maniscalco* upon the ground that his vehicle was parked in a

fenced-in, rather than unfenced driveway, concluding that "the defendant's possession of a loaded firearm occurred out-of-doors, and not in any sense inside his home."

■ The question of whether the possession of a weapon took place in the home is a question of law for the court (*see Maniscalco* at 378), and guided by our precedent as well as the spirit and intent of the statutes governing gun control, we conclude that the home exception does not apply here. The defendant's criminal possession of a loaded firearm occurred at the edge of his driveway, inches away from the public street and at a considerable distance away from his home. Moreover, the defendant did not have the equivalent degree of privacy in his driveway that he would have had in his home. Indeed, it is common for many different groups of individuals to have access to a homeowner's driveway, including delivery persons, trash collectors, and solicitors. Since the defendant's admitted possession of an unlicensed, loaded firearm took place, as a matter of law, outside his home, his challenge to the legal sufficiency and weight of the evidence adduced to support his conviction of criminal possession of a weapon in the third degree must be rejected.

■ The defendant's further contention that the trial court should have instructed the jury that it could consider whether his possession of a loaded firearm was justified as an emergency measure to avoid imminent injury pursuant to Penal Law § 35.05 (2) is without merit. The act of possessing a weapon unlawfully is distinct from the unlawful use of that weapon (*see People v Almodovar*, 62 NY2d 126, 130 [1984]; *People v Abdul-Hakeem*, 172 AD2d 177 [1991]). Accordingly, "[o]nce the unlawful possession of the weapon is established, the possessory crime is complete and any unlawful use of the weapon is punishable as a separate crime" (*People v Almodovar*, 62 NY2d at 130). Applying these principles in *Almodovar*, the Court of Appeals concluded that the defense of justification may excuse only the unlawful use of a weapon, not its unlawful possession. In this regard, the Court observed that "a person either possesses a weapon lawfully or he does not and he may not avoid the criminal charge by claiming that he possessed the weapon for his protection" (*id.*). Although both *Almodovar* and the Court of Appeals' subsequent decision in *People v Pons* (68 NY2d 264 [1986]) involved justification based on self-defense (Penal Law § 35.15), the rationale of these cases applies with equal force to justification based upon an emergency (Penal Law § 35.05 [2];

*see People v Abdul-Hakeem*, 172 AD2d at 178; *see also People v Johnson*, 30 AD3d 439 [2006]; *People v Laramore*, 1 Misc 3d 5 [2003]). Penal Law § 35.05 (2), like Penal Law § 35.15, is at its core designed to be a defense to conduct undertaken to prevent injury to oneself or others, not as a defense to a possessory offense. Thus, the trial court correctly denied the defendant's request for an emergency justification charge as it related to the count of the indictment charging criminal possession of a weapon.

■ The trial court also properly exercised its discretion in precluding the defendant from offering psychiatric testimony because of his failure to provide timely notice of his intent to do so. CPL 250.10 (2) provides that

> "[p]sychiatric evidence is not admissible upon a trial unless the defendant serves upon the people and files with the court a written notice of his intention to present psychiatric evidence. Such notice must be served and filed before trial and not more than thirty days after the entry of the plea of not guilty to the indictment." However, the trial court may allow late notice to be filed at any time prior to the close of the evidence in the "interest of justice and for good cause shown" (CPL 250.10 [2]).

The decision as to whether late notice should be permitted is a discretionary one, which requires the court to weigh the defendant's constitutional right to present witnesses in his own defense against the prejudice to the People arising from late notice (*see People v Berk*, 88 NY2d 257, 265-266 [1996], *cert denied* 519 US 859 [1996]).

Here, the defendant first provided notice of his intent to offer psychiatric testimony more than one year after he was indicted, and after his trial had already commenced. No "good cause" was offered for this extensive delay (*see People v Pitts*, 254 AD2d 742 [1998], *affd* 93 NY2d 571 [1999]; *People v Berk*, 88 NY2d at 266; *People v Dayton*, 66 AD3d 797, 798 [2009]; *People v Green*, 60 AD3d 1320, 1321 [2009]; *People v Sian Mai*, 175 AD2d 692, 693 [1991]). Moreover, the prejudice to the People arising from the failure to provide timely notice was not obviated by the fact that the defense had provided the prosecution with a copy of the psychiatrist's report, which indicated that it had been prepared for consideration in sentencing, approximately eight months prior to the commencement of the trial. The function of CPL 250.10 is to "promote procedural fairness and orderliness"

through the creation of a "format by which psychiatric evidence may be prepared and presented manageably and efficiently, eliminating the element of surprise" (*People v Almonor*, 93 NY2d 571, 577-578 [1999]). To this end, the People's right to demand an adversarial examination of the defendant by a psychiatrist or psychologist of their choice is not triggered until after the defendant gives notice (*see* CPL 250.10 [3]). The extremely untimely notice offered here, months after the defense had obtained a report from the psychiatrist it proposed to call as a witness and after the commencement of the trial, "thwarts CPL 250.10's intended promotion of procedural order, proper notification and adversarial examination" (*People v Hill*, 4 NY3d 876, 877 [2005]). Thus, the trial court was within its discretion in precluding the proposed psychiatric testimony.

■ The defendant's alternative argument that his examining psychiatrist's testimony should have been admitted "to provide background and cultural evidence" shedding light on how past incidents of racism may have influenced his perception of events on the night of the shooting is raised for the first time on appeal, and, thus, unpreserved for appellate review (*see* CPL 470.05 [2]). In any event, the defendant's claim is without merit. There is no indication in the record that the defendant's psychiatrist possessed "the requisite skill, training, education, knowledge or experience" (*Matott v Ward*, 48 NY2d 455, 459 [1979]) to provide reliable expert testimony regarding the history of racism in this country and its impact upon African Americans. Moreover, these issues are not "beyond the ken of the typical juror" (*People v Hill*, 85 NY2d 256, 261 [1995]; *see Matott v Ward*, 48 NY2d at 459).

■ The defendant's remaining challenges to the trial court's evidentiary rulings are also without merit. The admission of testimony that additional weapons, ammunition, and related paraphernalia were recovered from the defendant's home was proper because this evidence demonstrated his familiarity with guns and was thus probative of whether he acted recklessly (*see People v Roe*, 74 NY2d 20, 25-26 n 5 [1989]; *People v Johnson*, 205 AD2d 707 [1994]). The defendant's related claim that the prosecutor improperly commented on his possession of these weapons during summation is unpreserved for appellate review (*see People v Perry*, 68 AD3d 1020 [2009], *lv denied* 14 NY3d 804 [2010]), and, in any event, without merit since the subject remark was fair comment on the evidence (*see People v Ashwal*, 39 NY2d 105, 109 [1976]; *People v Williams*, 64 AD3d 800

[2009]; *People v Cummins*, 59 AD3d 458 [2009]). It was also proper for the trial court to preclude defense counsel from cross-examining a police detective about a racist remark the victim allegedly made to an employee at a car dealership, and about information which employees at the dealership may have possessed regarding whether the victim had previously engaged in a fight with an African-American individual. The detective testified that he did not interview anyone at the car dealership, and there is no indication that the defendant was aware of the victim's alleged past conduct on the night of the shooting (*see People v Fore*, 33 AD3d 932, 933 [2006]; *People v Pizzaro*, 184 AD2d 448, 449 [1992]). In addition, the trial court properly allowed the prosecutor to question the defendant and his wife about past calls they had made to 911, since this testimony was probative of the seriousness with which they viewed the threat posed by the teenagers, and the reasonableness of the defendant's belief that they were about to burglarize his home.

◼ The defendant's contention that the trial court coerced the jury to reach its verdict is unpreserved for appellate review (*see* CPL 470.05 [2]; *People v Roman*, 190 AD2d 831 [1993], *affd* 83 NY2d 866 [1994]; *People v Morales*, 36 AD3d 631, 632 [2007]), and, in any event, is without merit. The record reveals that on the evening of Saturday, December 22, 2007, after the jury had been deliberating for four days, the trial court delivered an *Allen* charge (*see Allen v United States*, 164 US 492 [1896]), to which the defendant raised no protest. The trial court then advised the jurors, who were not sequestered, that if any of them had "any religious obligation" the next morning that they would like to have taken into account, they should give the court officer a note so that accommodations could be made. The mere fact that the trial court's offer to accommodate religious obligations suggested that deliberations would continue the next day was not coercive and did not constitute error (*see People v Sharff*, 38 NY2d 751, 753 [1975]; *People v James*, 285 AD2d 561, 562 [2001]; *People v Davis*, 259 AD2d 627 [1999]; *People v English*, 215 AD2d 871, 872 [1995]).

◼ Finally, we cannot agree that this is an appropriate case for this Court to reverse the defendant's conviction in the interest of justice pursuant to CPL 470.15 (3) (c). The appellate courts have used this power sparingly to "vacate a conviction as to which reversal is not warranted on the law or the facts when 'there is a grave risk that an innocent man has been convicted' " (*People v Carter*, 63 NY2d 530, 536 [1984], quoting *People v*

*Kidd,* 76 AD2d 665, 668 [1980]; *see People v Gioeli,* 288 AD2d 488, 489 [2001]; *People v Crudup,* 100 AD2d 938, 939 [1984]). This is not the case here. We do not overlook the fact that the testimony of the prosecution's own witnesses reveals that the victim and his friends came to the defendant's home late at night seeking to engage in a fight with the defendant's son, that they exited their cars leaving the lights on and the engines running, that they shouted, cursed, and were disrespectful to the defendant, and that they ignored his demands to leave immediately. The law does not require that we turn a blind eye to human emotion, and we can appreciate that a parent in the defendant's situation would be concerned for the welfare of his son, and feel anger as the situation began to unfold. However, the defendant, instead of choosing the prudent alternative course of remaining inside and contacting the police, got dressed, loaded and unloaded a shotgun, and selected a loaded pistol to carry outside for his confrontation with the youths. The defendant then took the life of a 17 year old, shooting him at close range under circumstances which do not amount to legal justification. While this Court has been granted the extraordinary power to vacate a conviction in the interest of justice, we are not persuaded that it should be exercised here.

The defendant's remaining contentions are without merit.

Accordingly, the judgment is affirmed and the matter is remitted to the County Court, Suffolk County, for further proceedings pursuant to CPL 460.50 (5).

FISHER, J.P., ANGIOLILLO and LOTT, JJ., concur.

Ordered that the judgment is affirmed, and the matter is remitted to the County Court, Suffolk County, for further proceedings pursuant to CPL 460.50 (5).