People v Castro (2022 NY Slip Op 04191)

People v Castro

2022 NY Slip Op 04191

Decided on June 30, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:June 30, 2022

110681
[*1]The People of the State of New York, Respondent,
v
Joey M. Castro, Appellant.

Calendar Date:May 23, 2022

Before:Egan Jr., J.P., Lynch, Pritzker, Ceresia and Fisher, JJ.

Rural Law Center of New York, Castleton (Kelly L. Egan of counsel), for appellant, and appellant pro se.
G. Scott Walling, Special Prosecutor, Slingerlands, for respondent.

Pritzker, J.
Appeal from a judgment of the County Court of Saratoga County (Murphy III, J.), rendered December 17, 2018, upon a verdict convicting defendant of the crimes of assault in the first degree, criminal use of a firearm in the first degree, reckless endangerment in the first degree (two counts), criminal possession of a weapon in the third degree and failure to register an assault rifle.
On October 8, 2017, defendant and Jeffrey Castro, defendant's twin brother (hereinafter the brother), were socializing with their neighbors, Michael Desnoyers (hereinafter the victim), Rebecca Lackey, the victim's girlfriend, and Charles Miles, the victim's stepson, at Desnoyers' home in the Town of Moreau, Saratoga County after Miles and his friend cared for defendant's dog who had gotten loose. The brother departed the victim's home after a short while, but defendant continued to socialize in the victim's garage. As the evening went on, defendant made sexually charged and vulgar remarks to Lackey and, thereafter, the victim and defendant began to bicker. Ultimately, defendant left the victim's garage stating that he was going to get the brother. It is alleged that, minutes later, defendant returned with a gun and began shooting into the victim's garage at the victim, Lackey and Miles. The victim was struck by a bullet and paralyzed. In February 2018, defendant was charged in a nine-count indictment with various crimes stemming from the shooting. After a jury trial, defendant was convicted of assault in the first degree, criminal use of a firearm in the first degree, two counts of reckless endangerment in the first degree, criminal possession of a weapon in the third degree and failure to register an assault rifle. Defendant was sentenced to an aggregate prison term of 36&frac23; to 46 years, with a period of postrelease supervision. Defendant appeals.
Defendant asserts that his conviction for failure to register an assault rifle (count 9) is not supported by legally sufficient evidence as the trial evidence indicated that this firearm was owned by the brother, and was only in defendant's possession, thus, he had no registration obligation. We agree. As relevant here, pursuant to Penal Law § 400.00 (16-a) (a), an "owner" of certain assault weapons "must make an application to register such weapon with the superintendent of state police" within certain time periods (see Penal Law §§ 265.00 [22] [e], [f]; 400.00 [16-a] [a], [c]). Importantly, what is required here is ownership, not possession (see Penal Law § 400.00 [16-a]; compare Penal Law § 265.01-b). The testimony at trial — notably, by the brother — established that, although the brother allowed defendant to use the weapon, the brother was the one who purchased it and was the owner. Thus, "viewing the evidence in the light most favorable to the People, the evidence was not legally sufficient to support the conviction" for failure to register an assault rifle (People v McClendon, 199 AD3d 1233, 1235 [2021[*2]]). Accordingly, this count must be dismissed.
We turn now to defendant's next argument, that positive identification of the shooter was impossible due to the low level of illumination outside the garage and, thus, the verdict on all counts is not supported by the weight of the evidence. "[W]hen conducting a weight of the evidence review, we view the evidence in a neutral light and determine whether a different verdict would have been unreasonable; if a different verdict would not have been unreasonable, we weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Campbell, 196 AD3d 834, 835 [2021] [internal quotation marks and citation omitted], lvs denied 37 NY3d 1025 [2021]; see People v Bryant, 200 AD3d 1483, 1484 [2021], lv granted 38 NY3d 931 [2022]). At trial, the victim, Lackey, Miles and Miles' friend testified to their observations of defendant and the brother prior to the shooting. Although testimony varied as to what color and kind of pants defendant was wearing,[FN1] these witnesses, as well as the brother, testified that defendant was wearing a green Boston Celtics shirt. There was also testimony, including from the brother, that the brother was not wearing the same clothing as defendant and that the two men were distinguishable both in their appearances and the way their voices sounded.
As to the shooting, Miles testified that he was in the basement of the victim's residence when Lackey yelled that "there was going to be a fight." Miles ran back to the garage where he observed an individual wearing a green Celtics shirt and black sweatpants shoot a gun three times and say "Do you still think it's funny? Do you want to get f****** shot?" Although Miles testified that he could not see the shooter's face, he identified the shooter as defendant based upon his clothes and his voice. Lackey testified that, soon after defendant left, as she and the victim were cleaning up in the garage, she "heard jingling and leaves crunching" and then observed defendant "running across [the] front yard with a gun." Lackey verified that she was able to observe defendant's face and his clothing at this time. The victim attested that, after defendant departed, he heard someone coming across the lawn and Lackey stated "he's got a gun"; the victim then observed a gun in defendant's arms and defendant began shooting. The victim continued that he "saw [defendant's] face light up every time [defendant] shot the gun" and that he was further able to identify defendant because he was dressed in the same clothing that he had been in previously that night. The brother, while examining photographs taken of defendant upon his arrest, verified that defendant was wearing a Celtics shirt and Nike sweatpants that appeared black and, moreover, maintained that he had never worn these clothes. [*3]The brother also testified that he returned home approximately two hours before the shooting to go to bed because he had to work the next day.
Given the foregoing, since the jury could have discredited the eyewitness testimony establishing defendant as the shooter, another verdict would not have been unreasonable. Nevertheless, each eyewitness testified that, despite being twins, defendant and the brother were distinguishable both in how they looked and how their voices sounded. Moreover, each eyewitness verified that they had spent an extended amount of time with defendant preceding the shooting and all testified consistently as to what defendant was wearing at that time — clothing that the brother maintained he had never worn. Although defendant argues that lighting conditions would have made it impossible to identify the shooter, this issue was explored during trial and posed a credibility issue for the jury to resolve (see People v Campbell, 196 AD3d at 837; see also People v Demellier, 174 AD3d 1120, 1123 [2019], lv denied 34 NY3d 980 [2019]). Thus, "viewing the evidence in a neutral light and giving deference to the jury's credibility determinations," the verdict as to the remaining counts is not against the weight of the evidence (People v Campbell, 196 AD3d at 837; People v Banks, 181 AD3d 973, 975 [2020], lv denied 35 NY3d 1025 [2020]).
Defendant next alleges that County Court erred in denying his motion to reopen the Huntley hearing. A court may permit a defendant to renew his or her suppression motion and reopen a suppression hearing if, "after a pre-trial determination and denial of the motion the court is satisfied, upon a showing by the defendant, that additional pertinent facts have been discovered by the defendant which he [or she] could not have discovered with reasonable diligence before the determination of the motion" (CPL 710.40 [4]; see People v Newell, 148 AD3d 1216, 1219-1220 [2017], lv denied 29 NY3d 1035 [2017]). Here, after a Huntley hearing, County Court found that the People had established that defendant's statements during his initial interaction with law enforcement and the subsequent transfer to the State Police barracks were voluntary and that, in rebuttal, defendant failed to establish that these statements were "elicited unlawfully[] or were involuntary." Thereafter, defendant moved to reopen the hearing on the basis that the People had submitted a video recording of an interview of defendant conducted by the State Police during which law enforcement made comments "concerning the time period during which defendant . . . allegedly made the oral statements" and defendant continued to be questioned "after he asserted his right to an attorney." The court denied defendant's motion. Given that "defendant's motion here was premised entirely upon events that allegedly occurred at the time that he was initially questioned by law enforcement, i.e., events to which defendant could have testified or otherwise brought [*4]to light at the initial Huntley hearing," County Court did not abuse its discretion in denying defendant's motion to reopen the Huntley hearing (People v Rivera, 124 AD3d 1070, 1071 [2015], lvs denied 26 NY3d 971 [2015]; see People v Newell, 148 AD3d at 1220).
We find no merit to defendant's further contention that County Court's ruling precluding him from raising a psychiatric defense based upon his prescription medications deprived him of his ability to present a defense. There is no dispute that, despite being arraigned and entering a not guilty plea in April 2018, defendant did not file notice of a psychiatric defense until August 2018, long after the 30-day timeframe set by statute (see CPL 250.10 [2]). However, despite a preclusion motion filed by the People, County Court permitted the late notice premised primarily upon "late" disclosure of a video containing an interview by police of defendant in which he was exhibiting concerning behaviors. At this same time, the court adjourned the trial, which was previously scheduled to commence on September 4, 2018, until October 1, 2018 to allow defendant the opportunity to prepare this defense. To ensure fairness to all parties, the court set a schedule in which defendant was given approximately two weeks to be examined and provide a report to the People, and the People were given a two-week time period to have defendant examined, if they so wished. In a letter dated September 10, 2018, the People moved to compel defendant to execute certain authorizations to allow access to defendant's medical records, which County Court granted. The following day, the People supplemented this motion by adding additional authorizations, which the court again granted. Defendant opposed such authorizations as lacking statutory authority,[FN2] yet defense counsel instructed defendant to execute authorizations for his records but not those that would permit the People to speak with his providers. Defense counsel also sought clarification from the court as to the extent of the court's order. In response, the court reminded defense counsel that "it was agreed by all parties that any medical records which [defense counsel] believe[s] to be privileged [can] be turned over to [County Court] for an in camera review." On September 21, 2018, the People again moved to preclude presentation of psychiatric evidence because, among other things, defendant did not execute the required authorizations, which defendant opposed. County Court granted preclusion of all psychiatric evidence since, among other things, defendant did not comply with the court's scheduling orders and orders to execute the authorizations.[FN3]
As the Court of Appeals has made clear, "[t]he People cannot have a mental health expert of their choosing examine a defendant nor can they obtain his or her medical records due to the privileged and confidential nature of the evidence, unless the defendant wants to affirmatively use a mental condition as evidence at [*5]trial, thereby waiving Fifth Amendment rights and statutory privileges" (People v Silburn, 31 NY3d 144, 160 [2018] [emphasis added]). Thus, "a defendant who proffers [a psychiatric] defense may [not] hide behind that defense because of his [or her] privilege and thereby make the People's burden of proving sanity insurmountable" (Matter of Lee v County Ct. of Erie County, 27 NY2d 432, 440 [1971], cert denied 404 US 823 [1971]). Certainly, due to the short duration of time between defendant's filing of the CPL 250.10 notice and the trial date, executing the releases requested by the People in a timely matter was of great importance. Thus, given that defendant "repeatedly ignored legitimate requests" from County Court to execute the authorizations in question, "[the] [c]ourt made a measured effort to balance the [People]'s need for this information with defendant's right to offer this defense at trial" (People v Muller, 72 AD3d 1329, 1333 [2010], lv denied 15 NY3d 776 [2010]; see also People v LeFebvre, 45 AD3d 1175, 1175-1176 [2007]). Moreover, although defendant contends that the requested releases were too broad in scope and time, the court offered defendant a remedy by requesting that the court review the documents in camera, which defendant failed to request. Accordingly, County Court did not abuse its discretion by precluding defendant from presenting psychiatric evidence as a sanction for the repeated failure to timely execute authorizations that would allow the People to be granted access to defendant's medical records and medical providers (see generally People v Silburn, 31 NY3d at 161; People v Diaz, 15 NY3d 40, 47 [2010]; People v Segal, 54 NY2d 58, 67 [1981]; Matter of Lee v County Ct. of Erie County, 27 NY2d at 442; People v Crawford, 163 AD3d 986, 987-988 [2018], lv denied 32 NY3d 1063 [2018]; People v White, 75 AD3d 109, 124 [2010], lv denied 15 NY3d 758 [2010]).
Defendant also asserts that County Court erred in precluding an allegedly exculpatory statement made by defendant because it was necessary to provide a complete picture for the jury. Defendant concedes that, generally, a defendant may not elicit proof of his or her own out-of-court exculpatory statements (see People v Reynoso, 73 NY2d 816, 819 [1988]; People v Soriano, 121 AD3d 1419, 1422 [2014]). However, it is defendant's position that this exculpatory statement should have been admitted into evidence to "prevent the distortion that may result from admitting part of a statement out of context" (People v Horton, 181 AD3d 986, 993 [2020], lv denied 35 NY3d 1045 [2020]), pointing to testimony elicited by the People from a state trooper that, when defendant first saw the trooper, he held his hands up in the air.[FN4] This argument, however, is misplaced. Initially, the exculpatory statement that defendant sought to elicit was that, when the trooper asked defendant about the gun, defendant responded "I don't know what you're talking about." The testimony of the trooper at [*6]the Huntley hearing demonstrated that many events transpired between defendant first seeing the trooper and putting his hands in the air and the exculpatory statement, including placing defendant in handcuffs and having two witnesses come and identify defendant as the shooter. Accordingly, County Court did not err in not permitting defendant to elicit this self-serving out-of-court statement (see id.).
We are also unpersuaded by defendant's assertions of prosecutorial misconduct and judicial bias. As to prosecutorial misconduct, defendant points to a representation by the People that their inability to secure an expert witness was the result of his failure to execute the ordered medical authorizations when, in truth, they had not reached out to an expert until September 11, 2018. This, however, was not a misrepresentation. Rather, the People broadly argued that they had been prejudiced by defendant's failure to serve a timely notice and, thereafter, failure to supply the requested authorizations, which were the cause of the unavailability of their sought-after expert. Defendant also contends that it was prosecutorial misconduct for the prosecutor, during his summation, to state that defendant and his brother were identical twins because this was a "knowingly false representation" as the evidence only supported that the two were twins — not that they were identical. Even if we were to find that this was a misstatement of the evidence, this singular challenged statement in summation cannot be seen as "a flagrant and pervasive pattern of prosecutorial misconduct" such that defendant suffered substantial prejudice resulting in a denial of due process (People v Gertz, 204 AD3d 1166, 1171 [2022]; see People v Kabia, 197 AD3d 788, 791-792 [2021], lv denied 37 NY3d 1162 [2022]). As to defendant's claims of judicial bias, to the extent preserved, we have carefully reviewed the record and find that it does not disclose any evidence of judicial bias (see People v Casatelli, 204 AD3d 1092, 1098 [2022]; People v Dickinson, 182 AD3d 783, 790 [2020], lv denied 35 NY3d 1065 [2020]).
We next turn to defendant's claims regarding his sentence. Initially, we find no merit to defendant's contention that County Court's imposition of consecutive sentences on the convictions of reckless endangerment in the first degree was illegal inasmuch as defendant fired his weapon multiple times, thus, his reckless endangerment convictions arose from separate acts (see People v Smith, 171 AD3d 1102, 1105-1106 [2019], lv denied 33 NY3d 1073 [2019]; People v Guzy, 167 AD3d 1230, 1237-1238 [2018], lv denied 33 NY3d 948 [2019]). Finally, although County Court imposed the maximum allowable prison sentence for each conviction, given the abhorrent conduct and grievous injury to the victim, and the risk of serious injury faced by Lackey and Miles due to defendant's actions, we decline his invitation to reduce his sentence in the interest of justice (see generally People v Lyons[*7], 200 AD3d 1222, 1226 [2021], lv denied 37 NY3d 1162 [2022]; People v Wager, 173 AD3d 1352, 1359 [2019], lv denied 34 NY3d 1020 [2019]). We have reviewed defendant's remaining contentions, including those contained in his pro se brief, and find them to be lacking in merit.
Egan Jr., J.P., Lynch, Ceresia and Fisher, JJ., concur.
ORDERED that the judgment is modified, on the law, by reversing defendant's conviction of failure to register an assault rifle under count 9 of the indictment; said count dismissed and the sentence imposed thereon vacated; matter remitted to the County Court of Saratoga County for further proceedings pursuant to CPL 460.50 (5); and, as so modified, affirmed.

Footnotes

Footnote 1: Multiple witnesses did, however, testify that defendant was wearing black Nike sweatpants.

Footnote 2: We are not reaching the issue of whether County Court had authority to order defendant to execute these releases because defendant did not raise such an argument on appeal.
Footnote 3: As noted by County Court, the authorizations central to the dispute were executed on September 24, 2018, after the People's renewed preclusion motion and days before the court's decision thereon.

Footnote 4: Defendant also claims that the trooper's testimony about this "testimonial action" should have been precluded, however he concedes that this argument is not preserved inasmuch as defendant did not object to the testimony or seek preclusion.