REENA RAGGI, Circuit Judge,
dissenting:
My colleagues Judges Pooler and Cala-bresi conclude, albeit for different reasons, that we lack jurisdiction over this interlocutory appeal from a denial of qualified immunity. Judge Pooler thinks that certain omissions from defendant Michael Riley’s affidavit in support of a search warrant for premises inhabited by plaintiff Ronita McColley raise questions of fact as to probable cause to search at all. Judge Calabresi thinks the omissions undermine authorization to conduct the search on a “no knock” basis. I respectfully disagree with both conclusions.
Whatever weight a judicial officer might give the omitted facts here at issue, it would not be enough to give rise to a “genuine dispute that a magistrate would have issued the warrant.” Velardi v. Walsh, 40 F.3d 569, 574 (2d Cir.1994) (emphasis omitted) (concluding that affiant entitled to qualified immunity because factual errors, even if deliberate, could not possibly have affected magistrate’s decision to issue warrant). This is because an affidavit that includes the omitted information demonstrates probable cause to search as a matter of law. See Smith v. Edwards, 175 F.3d 99, 105 (2d Cir.1999) (Sotomayor, J.) (instructing that “[i]f probable cause remains” after warrant is corrected, plaintiff has suffered no violation of Fourth Amendment rights (internal quotation marks omitted)). The same conclusion obtains with respect to no-knock execution of the warrant, which required a showing only of reasonable suspicion — not probable cause — that law enforcement officers would be endangered or evidence would be destroyed if officers announced their presence before entering the target premises.
Even if there were any doubt as to actual probable cause or reasonable suspicion in this case — which I submit there is not — the determinative issue for purposes of qualified immunity is not what weight the issuing judge would assign to omitted facts in reviewing a corrected affidavit, but whether an officer in defendant’s position could have held an objectively reasonable — even if mistaken — belief that the corrected affidavit demonstrated the necessary probable cause and reasonable suspicion. This is evident from Escalera v. Lunn, 361 F.3d 737 (2d Cir.2004), which held that if a corrected affidavit provides “an objective basis to support arguable probable cause, remaining factual disputes are not material to the issue of qualified immunity and summary judgment should be granted to the defendant on the basis of qualified immunity.” Id. at 744. As Escalera explained, “[o]nly if the corrected affidavit would not support a reasonable officer’s belief that probable cause existed would the identified factual disputes be material” so as to warrant denial of qualified immunity. Id. (internal quotation marks omitted); see also Messerschmidt v. Millender,—U.S.-, 132 S.Ct. 1235, *838 1244, 182 L.Ed.2d 47 (2012) (stating that qualified immunity provides officials with “breathing room to make reasonable but mistaken judgments” (internal quotation marks omitted)); Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (stating that qualified immunity is available where “officers of reasonable competence could disagree” on the legality of the action at issue in its particular factual context).
Upon review of a corrected affidavit, I identify no material question of fact as to the existence of probable cause to search or reasonable suspicion to do so on a no-knock basis, much less any dispute as to the existence of arguable probable cause or reasonable suspicion. Accordingly, I would exercise jurisdiction and order that judgment be entered in favor of Riley on grounds of qualified immunity. See Escal-era v. Lunn, 361 F.3d at 743 (stating that we have jurisdiction to award summary judgment where no material factual dispute exists as to qualified immunity); Ti-erney v. Davidson, 133 F.3d 189, 194-95 (2d Cir.1998) (same). I therefore respectfully dissent.
A. The Corrected Affidavit
To explain my disagreement, I start by discussing the warrant at issue, the complained-of omissions from the supporting affidavit, the “corrected affidavit” standard of review, and the contents of a corrected affidavit in this case.
On June 27, 2008, a Troy city court judge issued search warrants for four premises reportedly used for drug trafficking: (1) 520 Second Avenue, Apt. 5; (2) Building 5 Griswold Heights, Apartment 17; (3) 17 101st Street, 1st floor apartment; and (4) 396 First Street, 1st floor apartment. In support of warrants to search the last three locations, defendant Riley, a criminal investigator with the Rensselaer County District Attorney’s Office, swore to a common affidavit based largely on information recently obtained from a confidential informant (“Cl”).
In challenging the search of the First Street apartment where she resided with her daughter, plaintiff McColley contends that Riley misled the issuing judge by omitting certain facts from his supporting affidavit, notably, that (1) McColley, a person with no criminal history, was the record resident of the First Street apartment; and (2) periodic street surveillance starting on June 25, 2008, failed to reveal any evidence of drug activity at the premises. See Pooler Op., ante at 823-24. For McColley to demonstrate that these omissions made the warrant-authorized search of her home unreasonable under the Fourth Amendment, she must show not only that Riley “knowingly and intentionally” omitted the specified information from his warrant affidavit, but also that the omitted facts were “necessary to the finding of probable cause” to search and to the finding of reasonable suspicion to do so on a no-knock basis. Franks v. Delaware, 438 U.S. 154, 155-56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); see Escalera v. Lunn, 361 F.3d at 743.
To make the latter assessment, we look to a hypothetical “corrected affidavit,” produced by adding to the original warrant affidavit the omitted information highlighted by McColley as well as any other pertinent omitted information. See Escalera v. Lunn, 361 F.3d at 744 (“In performing this correcting process, we examine all of the information the officers possessed when they applied for the arrest warrant.”). We must then determine whether the corrected affidavit does or does not demonstrate the necessary probable cause and reasonable suspicion. See Smith v. Edwards, 175 F.3d at 105.
*839 This is a de novo inquiry, not limited to the deferential “substantial basis” review we conduct when a plaintiff challenges a search incident to a warrant on the grounds that it was supported by an insufficient, but not deliberately misleading, affidavit. Velardi v. Walsh, 40 F.3d at 574 n. 1 (internal quotation marks omitted). Where there is no dispute as to what facts a judicial officer relied on — or in the case of a corrected affidavit, should have relied on — in making a probable cause or reasonable suspicion determination, the existence of probable cause and reasonable suspicion is generally a matter of law for the court. See Walezyk v. Rio, 496 F.3d 139, 157 (2d Cir.2007). To the extent Velardi observed that the weight a judicial officer would give omitted information is a question of fact, disputes as to that question might require a jury trial in “doubtful cases” of probable cause or reasonable suspicion; but, as Justice (then Judge) Sotomayor explained in Smith v. Edwards, that conclusion does not obtain “where a court is able to determine, as a matter of law, that the corrected affidavit would have been sufficient to support a finding of probable cause” or reasonable suspicion. 175 F.3d at 105-06 n. 5 (noting that in both Velardi and Smith, court was able to decide, as a matter of law, that corrected affidavit stated probable cause). Thus, if probable cause and reasonable suspicion remain after a warrant is corrected to add omitted information, “no constitutional violation of plaintiffs Fourth Amendment rights has occurred.” Id. at 105 (internal quotation marks omitted); see United States v. Ra-jaratnam, 719 F.3d 139, 147 (2d Cir.2013); see generally Singer v. Fulton Cnty. Sheriff, 63 F.3d 110, 118 (2d Cir.1995) (“There can be no federal civil rights claim for false arrest where the arresting officer had probable cause”). Indeed, where a corrected warrant demonstrates probable cause or reasonable suspicion as a matter of law, “any disputed factual issues cannot be deemed ‘material,’ and summary judgment is warranted” for the defendant. Smith v. Edwards, 175 F.3d at 105.[1]
*840 A corrected affidavit would here disclose the following facts:[2]
(1) The Cl providing information referenced in the affidavit was a person known to law enforcement officials.
(2) The Cl had a track record for reliability, having provided information on previous occasions leading to four controlled purchases of drugs and supporting two search warrants that resulted in the seizure of drugs and contraband.
(3) The Cl had recently provided authorities with eyewitness information about illegal drug dealing by persons known to him as “Stink” and “Sport,” both of whom worked for “Chuck.” The Cl described Stink, whom the Cl had known since childhood, as a medium-skinned black male with visible eczema, 22 years of age, weighing 190-200 pounds. He described Sport as a dark-skinned black male in his twenties, with short black wavy hair, weighing 155 pounds, and 5'8" tall. The Cl provided a cell phone number for Sport.
(4) On June 23, 2008, under the supervision of law enforcement authorities, the Cl made a controlled purchase of crack cocaine from Sport at 520 Second Avenue, Apartment 5, a location that the Cl described as Sport’s residence.
(5) The Cl subsequently reported to authorities that approximately one hour after this Second Avenue buy, Sport brought the Cl to the first floor apartment at 396 First Street to show the Cl where he got his drugs.
(6) The Cl stated that Stink has custody and control over the First Street apartment, as well as over the first floor apartment at 17 101st Street and Apartment 5 at 520 Second Avenue, using all three locations to sell crack cocaine and marijuana.
(7) The affiant knew from training and experience that drug dealers often keep their drugs at and operate out of several locations in order to prevent loss from police seizures or home invasions by competing drug dealers.
(8) The Cl described 396 First Street as an unpainted brick edifice with yellow exterior doors, five buildings south of “Nature’s Pub.” He also identified the building from a photograph, which was then attached to the warrant affidavit.
(9) An electronic records check revealed the registered resident of the First Street apartment to be Ronita McColley, a person with no criminal record who lived at the premises with her daughter.
(10) The Cl reported that when he entered the First Street apartment with Sport, the Cl saw Stink using a King of Hearts playing card to scrape approximately 7 grams of powder cocaine from a scale. Stink then placed this cocaine into a baggie. Meanwhile, an unknown black male in the apartment gave Sport a sandwich-sized baggie filled with smaller black zip-loc baggies of crack cocaine. The Cl reported that these zip-loc baggies were similar in appearance to those involved in the Cl’s recent purchases of crack cocaine from Sport at 520 Second Avenue.
*841 (11) The Cl advised that on approximately 20 to 30 occasions over the last six months, and as recently as the past week, he had been present in Apartment 17 of Building 5 Griswold Heights and, on each occasion, had seen Stink deal drugs from that location.
(12) The Cl reported that the registered tenant of the Griswold Heights apartment was Tanisha Bruce, who lived at the location with her two children, mother, and sister. The Cl stated that Bruce dealt approximately 100 grams of marijuana per week supplied to her by Stink. He further stated that Stink occasionally stayed at the Griswold Heights Apartment and had custody and control over drug activity at that site.
(13) The Cl stated that Stink regularly resided with his girlfriend in the first floor apartment at 17 101st Street. The Cl reported having been inside that apartment on two occasions within the past two weeks when Stink sold crack cocaine there.
(14) Between June 25 and June 27, 2008, law enforcement authorities conducted periodic street surveillance of the outside of each of the premises for which search warrants were sought. That surveillance revealed no evidence of criminal activity.
(15) The affiant knew from personal experience that, by giving prior notice of execution of a warrant, suspects will have time to prepare themselves against officers’ forced entry, which may endanger the lives and safety of the officers and persons inside the residence.
(16) The affiant knew from training and experience that drug dealers often possess firearms and other weapons to safeguard their illegal activities.
(17) The Cl had reported that Stink, Sport, and Chuck all had access to and possessed firearms.
(18) The affiant also knew from personal experience that it is common practice for drug dealers to attempt to destroy or dispose of drugs upon notice of execution of a search warrant.
B. Probable Cause To Search
1. The Corrected Affidavit Demonstrates Probable Cause as a Matter of Law
In considering whether such a corrected affidavit demonstrates probable cause to search as a matter of law — thereby precluding any genuine dispute as to whether a judge would have issued a search warrant for the First Street apartment — it is useful to recall the standard for probable cause. Probable cause to search exists where circumstances indicate a “fair probability that contraband or evidence of a crime will be found in a particular place.” Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); see Stansbury v. Wertman, 721 F.3d 84, 89 (2d Cir.2013) (stating that “court examines each piece of evidence and considers its probative value, and then looks to the totality of the circumstances to evaluate whether there was probable cause” (alteration and internal quotation marks omitted)). This “fluid” standard does not demand “hard certainties” but only facts sufficient to establish the sort of “fair probability” on which “reasonable and prudent men, not legal technicians, act.” Illinois v. Gates, 462 U.S. at 231-32, 238, 103 S.Ct. 2317; see Florida v. Harris,—U.S.-, 133 S.Ct. 1050, 1055, 185 L.Ed.2d 61 (2013) (observing that probable cause is “practical,” “eommon-sensical,” “all-things-considered” standard).[3]
*842 Here, there can be no question as to the “fair probability” that evidence of drug dealing would be found in the First Street apartment. The corrected affidavit — like the original one — reported current drug dealing at that location, as well as at other sites associated with the same group of dealers. Because the information came from a Cl, the “core question in assessing probable cause” to search these premises was whether the information supplied by the informant was sufficiently “reliable.” United States v. Wagner, 989 F.2d 69, 72 (2d Cir.1993). Informant reliability is properly evaluated by reference to the totality of the circumstances. See Illinois v. Gates, 462 U.S. at 232-33, 103 S.Ct. 2317. While Judge Pooler’s opinion repeatedly references this standard, it in fact fails to apply it, discussing only how the omitted facts might cast doubt on the reliability of the Cl’s information. Illinois v. Gates, however, specifically requires that a reliability inquiry be holistic and recognizes that deficiencies in one area may well be compensated for by a strong showing in another. See id.; United States v. Step-pello, 664 F.3d 359, 364 (2d Cir.2011) (holding district court erred in considering “individual facts in isolation” when evaluating probable cause). In this case, the totality of the facts in the corrected affidavit so strongly supports the reliability of the Cl’s information that, even with the addition of the omitted matters, probable cause to search the First Street apartment is established as a matter of law.
To begin, the Cl was a person known to law enforcement officers and not an anonymous tipster, a circumstance that we have recognized weighs in favor of reliability. See United States v. Elmore, 482 F.3d 172, 180-81 (2d Cir.2007) (observing that information from known source is generally entitled to more weight than that from anonymous tipster because police can better assess former’s reputation and hold him accountable if allegations turn out to have been fabricated); United States v. Gagnon, 373 F.3d 230, 236 (2d Cir.2004) (same).
In addition to being known, the Cl here had a proven record of reliability, having provided information in the past that had led to two search warrants resulting in drug seizures and to four controlled purchases of narcotics. We have observed that information provided by an informant from whom the government “has received consistently reliable information in the past is likely to be sufficiently reliable to establish probable cause.” United States v. Wagner, 989 F.2d at 73; see also United States v. Sidwell, 440 F.3d 865, 869 (7th Cir.2006) (holding probable cause existed where “informant had completed numerous other controlled buys in the past and provided, on those occasions, accurate and reliable information”).
Moreover, the information provided by this known, reliable Cl as to drug dealing in each of the premises for which search warrants were sought was based on his *843 own first-hand observations, a circumstance we have recognized as “easily” establishing probable cause. United States v. Wagner, 989 F.2d at 73 (stating probable cause “easily established” where informant described occasions on which he personally witnessed drug-related activities in suspect’s home). That conclusion is only reinforced by the fact that the Cl’s information here was frequently detailed insofar as it included the street names, physical descriptions and, in one case, the cell phone number, for the two persons whose drug deals the Cl had witnessed in the locations for which warrants were being sought. See Illinois v. Gates, 462 U.S. at 234, 103 S.Ct. 2317 (recognizing that detailed information entitled to great weight in assessing reliability); United States v. Hernandez, 85 F.3d 1023, 1028 (2d Cir.1996) (holding that Cl’s “detailed eye-witness report of crime,” such as description of apartment, its occupants, and drug transactions, established probable cause (internal quotation marks omitted)).
Indeed, in the case of drug dealing at the First Street premises, the Cl’s account was particularly detailed. He reported that “Sport” had taken him to the First Street apartment approximately one hour after the Cl had made a successful controlled purchase of crack from Sport at the dealer’s Second Avenue residence. Sport told the Cl that the First Street apartment was where he got his drugs and, indeed, the Cl saw an unknown man in thé First Street apartment supply Sport with baggies of crack that were packaged similarly to the crack the Cl had acquired from Sport earlier that same day in the controlled purchase. Further, the Cl reported that, in the First Street apartment, he also saw “Stink,” a person known to him since childhood, using a playing card, specifically identified as the King of Hearts, to scrape what the Cl estimated to be 7 grams of cocaine from a scale into a baggie. The Cl related occasions when he had seen Stink deal drugs from two other locations, one his home and the other the residence of a woman identified as Tanisha Bruce.
Additionally, the information provided was current, the Cl having witnessed the drug dealing in the First Street apartment only a few days before a search warrant was initially sought and obtained. Cf. Rivera v. United States, 928 F.2d 592, 602 (2d Cir.1991) (observing that in cases of ongoing narcotics operations, intervals of weeks or months between described act and warrant application did not necessarily make information stale).
Finally, the information supplied was corroborated in varying respects. Insofar as the Cl reported that Stink and Sport used various locations to conduct their drug activity, this found corroboration in Riley’s own training and experience, which confirmed that drug dealers frequently operated out of various locations to minimize the risk that they would lose their supplies to police searches or rivals’ thefts at a single location. See United States v. Clark, 638 F.3d 89, 98 (2d Cir.2011) (recognizing even partial corroboration to be relevant to assessment of reliability); United States v. Canfield, 212 F.3d 713, 719-20 (2d Cir .2000) (same). Moreover, the Cl had successfully made a controlled purchase of crack from Sport on June 23, 2008, a circumstance we have recognized as “powerful corroborative evidence” of the Cl’s reliability in reporting first-hand observations of other drug trafficking by the supplier or his confederates. United States v. Wagner, 989 F.2d at 73. Such a conclusion is especially warranted here, where it was the seller of the drugs involved in the controlled purchase who, within an hour of that transaction, brought the Cl to the First Street apartment, representing it to be the place where he got *844 his drugs. We also have denominated as “self-corroborating” detailed reports of drug dealing witnessed first-hand by an informant, such as the Cl here provided with respect to his observations inside the First Street apartment. United States v. Smith, 9 F.3d 1007, 1013 (2d Cir.1993).
By comparison, the omitted information, even when viewed in the light most favorable to McColley, does little to undercut the reliability of the Cl’s account. Insofar as the record resident of the First Street premises was Ronita McColley, a woman with no criminal record and a young child, the issuing judge already knew that Sport and Stink dealt drugs out of various premises, including one other apartment — at Griswold Heights — where a single mother, Tanisha Bruce, resided with her children. Thus, it could not have made any difference to a judge’s probable cause determination to learn that the registered occupant of the First Street premises was also a single mother.[4] Insofar as the Cl implicated Bruce in drug trafficking, whereas McColley had no criminal record, the latter fact raises no genuine dispute as to whether the judge would have issued a search warrant. The probable cause question was not whether there was a fair probability to think that McColley herself was dealing drugs, but whether there was a fair probability to think that evidence of drug dealing would be found in her apartment. That probable cause question must be answered “yes” in light of the reliable Cl’s detailed account of the drug activity he witnessed inside the First Street apartment on June 23, 2008, and his identification of two of the men involved in that activity.
In short, even if we cannot know the precise weight an issuing judge might give omitted facts about McColley’s identity as the record resident of the First Street apartment, we do know, in light of the totality of circumstances strongly indicating the reliability of the Cl’s information, that the omissions could not bear a weight sufficient to raise a genuine issue as to the existence of probable cause. See generally United States v. Rajaratnam, 719 F.3d at 149-50 & n. 11, 157 & n. 21 (affirming district court’s holding that alleged misstatements and omissions, including omission of informant’s criminal history, were not material in light of other indicia of informant’s reliability, such as fact that informant was known and had made statements against penal interest, and government was able to corroborate some statements); Velardi v. Walsh, 40 F.3d at 575 (finding omitted facts that drug supplier had not been seen armed and that no drug transactions had taken place at residence to be searched “were simply not material” where affidavits did not imply that supplier was armed or dealing drugs from his home and totality of evidence otherwise established probable cause as matter of law).
The same conclusion applies with even more force to omitted information about the unproductive results of sporadic police surveillance on the exteriors of the premises for which search warrants were sought. Our precedent instructs that an “otherwise sufficient application for a search warrant need not relate unproductive or unsuccessful efforts in the course of the investigation.” United States v. Smith, 9 F.3d at 1014. In any event, even when the surveillance results are included in a correct *845 ed affidavit, they cannot raise a serious question as to the existence of probable cause because those results indicate only that between June 25 and June 27, 2008, on those occasions when officers had the outside of 396 First Street in view, they did not see any sign of criminal activity. To state the obvious, this hardly precluded drug trafficking on June 23; much less did it foreclose the fair probability that drugs or evidence of prior drug trafficking would be found inside the premises. That probability was so plainly established by the detailed, eyewitness account of a reliable Cl that whatever weight a judge might give the surveillance results, it would not be enough to raise a genuine issue of fact as to probable cause.
In concluding otherwise, Judge Pooler observes that any omissions from a warrant based on information provided by a confidential informant must be deemed “glaring” and “all the more likely to be ‘critical’ to the evaluation of probable cause.” Pooler Op., ante at 824 (quoting Walczyk v. Rio, 496 F.3d at 161). This reliance on Walczyk is misplaced. What that case states — in a context unrelated to confidential informants — is that “the law does not demand that an officer applying for a warrant ‘volunteer every fact that arguably cuts against the existence of probable cause,’ as long as he does’not omit circumstances that are critical’ to its evaluation.” Walczyk v. Rio, 496 F.3d at 161 (quoting Brown v. D’Amico, 35 F.3d 97, 99 (2d Cir.1994)). McColley’s identity and the surveillance results were not critical to an assessment of probable cause in this case. While these facts did not reinforce the reliability of the Cl’s information about drug dealing at the First Street apartment, neither did they undermine that reliability as strongly established in this case by the Cl’s past record for reliability, direct participation in a controlled purchase of drugs from Sport, and detailed eyewitness account of drug dealing by Sport and Stink in the First Street apartment within an hour of the controlled purchase as well as in other premises for which warrants were" sought within the preceding two weeks.
In sum, on the totality of circumstances presented in the corrected affidavit, I conclude that probable cause to search was so plainly established as a matter of law as to admit no genuine issue of fact as to whether a judge would issue the requested warrants.
2. The Corrected Affidavit Demonstrates Arguable Probable Cause
Assuming arguendo that the corrected affidavit did not demonstrate probable cause as a matter of law to search the First Street apartment for evidence of drug dealing, the record will not admit a conclusion that Riley lacked the arguable probable cause that would still entitle him to qualified immunity. Our court has recognized arguable probable cause to exist “if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.” Escalera v. Lunn, 361 F.3d at 742 (internal quotation marks omitted); accord Gonzalez v. City of Schenectady, 728 F.3d 149, 157 (2d Cir.2013); see also Caldarola v. Calabrese, 298 F.3d 156, 162 (2d Cir.2002) (“[I]n situations where an officer may have reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless entitled to qualified immunity.”).
Here, Riley knew that (1) a known Cl, with (2) a record of past reliability, had reported to investigating officers that within an hour of (3) making a successful controlled purchase of drugs from Sport on June 23, 2008, (4) Sport had taken the *846 Cl to the First Street apartment where Sport indicated he got his drugs, and (5) therein, the Cl witnessed Sport and Stink (a person known to the Cl since childhood) package and receive drugs. Riley further knew that the Cl (6) had provided detailed descriptions of Sport and Stink, the building on First Street where he was taken, and the activities he had witnessed therein. He also knew that the Cl had (7) reported seeing Stink deal drugs on several occasions over the last two weeks at two other identified locations. In light of precedent recognizing each of these enumerated circumstances as indicative of the reliability of the Cl’s information, see Illinois v. Gates, 462 U.S. at 234, 103 S.Ct. 2317; United States v. Rajaratnam, 719 F.3d at 149-50 & n. 11,157 & n. 21; United States v. Clark, 638 F.3d at 98; United States v. Elmore, 482 F.3d at 180-81; United States v. Sidwell, 440 F.3d at 869; United States v. Gagnon, 373 F.3d at 236; United States v. Canfield, 212 F.3d at 719-20; United States v. Hernandez, 85 F.3d at 1028; United States v. Smith, 9 F.3d at 1013; United States v. Wagner, 989 F.2d at 73; Rivera v. United States, 928 F.2d at 602, we can hardly label it “plainly incompetent” for an officer in this case to think that there was a “fair probability” that evidence of drug trafficking would still be found in the First Street apartment within a week of the Cl’s report, Malley v. Briggs, 475 U.S. at 341, 106 S.Ct. 1092 (holding that qualified immunity protects “all but the plainly incompetent or those who knowingly violate the law”).
Nor will the omitted facts permit a different conclusion. Riley knew from his own experience that drug dealers often used multiple sites to store and deal drugs, and the Cl had already identified one single mother, Tanisha Bruce, whose residence Stink used to deal drugs. Thus, Riley’s discovery that the First Street apartment was registered to another single mother was hardly reason for him to retreat from a fair probability determination that evidence of the drug dealing witnessed by the Cl would be found at that location. As for McColley’s lack of criminal history, we cannot conclude that no reasonable officer would credit a reliable Cl’s eyewitness account of drug dealing in a particular location simply because the record resident did not have a criminal record.
Nor can we conclude that no reasonable officer would think he had probable cause to search an apartment where a reliable Cl recently witnessed drug activity simply because sporadic surveillance of the exteri- or of the premises a few days later yielded no results. Quite apart from the fact that such surveillance could not detect activities inside the First Street apartment, probable cause to search the premises did not require evidence of criminal activity on the dates of the surveillance; it required only a fair probability that evidence of criminal conduct occurring at some time be found on the premises. A reasonable officer was entitled to conclude that such a probability was satisfactorily established by the Cl’s eyewitness account of Sport’s and Stink’s activities in the First Street apartment on June 23, 2008, within an hour of the Cl’s controlled purchase of crack cocaine from Sport at another location.
Thus, even if the corrected affidavit does not state probable cause as a matter of law — which I submit it does — it certainly provides “an objective basis to support arguable probable cause.” Escalera v. Lunn, 361 F.3d at 744. Because the existence of arguable probable cause renders any factual disputes arising out of omitted information “not material to the issue of qualified immunity,” I respectfully submit that the inability to discern what weight a judge might give the omitted information in making a probable cause determination *847 is immaterial to qualified immunity. See id.; accord Gonzalez v. City of Schenectady, 728 F.3d at 155-58 (awarding qualified immunity where arguable probable cause existed for arrest, even though actual probable cause was absent); see also Ve-lardi v. Walsh, 40 F.3d at 573 (“[Pjlaintiffs may not unwrap a public officer’s cloak of immunity from suit simply by alleging even meritorious factual disputes relating to probable cause, when those controversies are nevertheless not material to the ultimate resolution of the immunity issue.” (internal quotation marks omitted)).
In the absence of a material factual dispute as to Riley’s entitlement to qualified immunity on McColley’s probable cause challenge, I respectfully submit that we have jurisdiction to award him summary judgment. See Escalera v. Lunn, 361 F.3d at 743; Tierney v. Davidson, 133 F.3d at 194-95.
C. Reasonable Suspicion To Execute a No-Knock Search
In concurring in the decision to dismiss for lack of jurisdiction, Judge Calabresi concludes that McColley must be denied qualified immunity because the corrected affidavit fails to support a no-knock entry of the First Street apartment. See Cala-bresi Op., ante at 832-37.[5] I cannot agree.
1. The Corrected Affidavit Demonstrates Reasonable Suspicion
The Supreme Court has construed the Fourth Amendment to incorporate the common law requirement that police officers entering a dwelling must announce their identity and purpose before attempting forcible entry. See Wilson v. Arkansas, 514 U.S. 927, 930, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995); see also 18 U.S.C. § 3109 (codifying knock-and-announce requirement with respect to entries by federal law enforcement officers). For an unannounced, or no-knock, entry to be constitutionally reasonable, police “must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence.” Richards v. Wisconsin, 520 U.S. 385, 394, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997). The Supreme Court has declined to recognize categorical exceptions to this reasonable suspicion requirement. Notably, in Richards it rejected the argument that drug felony cases warranted a categorical exception based on the “culture” of violence and evidence destruction that is characteristic of that criminal activity. Id. at 392-94, 117 S.Ct. 1416. While Richards holds that police must make a reasonable suspicion showing “whenever the reasonableness of a no-knock entry is challenged,” the Court there emphasized that “[tjhis showing is not high,” requiring only a “ ‘reasonable belief based on specific and articulable facts.’ ” Richards v. Wisconsin, 520 U.S. at 394, 117 S.Ct. 1416 (quoting Maryland v. Buie, 494 U.S. 325, 337, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), and citing Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).
Applying that standard here, I note that the original affidavit reported not only Riley’s general experience with drug dealers’ trying to destroy evidence upon learning that law enforcement officers were entering the premises, but also the Cl’s specific report that the drugs stored at the First *848 Street apartment were packaged in readily disposable form, ie., zip-loc baggies containing small quantities of crack cocaine. Judge Calabresi dismisses these case-specific facts with a seemingly rhetorical question: “when are drugs, by their nature compact in size, not in such small packages?” Calabresi Op., ante at 834. In fact, our case law easily demonstrates that drugs are frequently packaged in much larger sizes than were evident in this case. See, e.g., United States v. Roberts, 660 F.3d 149, 153-54 (2d Cir.2011) (discussing seizure of five one-kilogram “bricks” of cocaine); United States v. English, 629 F.3d 311, 313-14 (2d Cir.2011) (discussing 5 and 10 kilogram packages of cocaine); United States v. Navas, 597 F.3d 492, 495-96 (2d Cir.2010) (discussing 230 kilograms of cocaine hidden under metal roof of trailer); United States v. Valentine, 539 F.3d 88, 89 (2d Cir.2008) (discussing cocaine concealed inside furniture); United States v. Beltempo, 675 F.2d 472, 474 (2d Cir.1982) (discussing 16 pounds of heroin concealed in false bottoms of suitcases). In any event, the Supreme Court in Richards specifically recognized “the easily disposable nature of the drugs” in that case as a factor justifying the no-knock entry at issue. 520 U.S. at 396, 117 S.Ct. 1416 (holding that petitioner’s “apparent recognition of the officers combined with the easily disposable nature of the drugs” justified “decision to enter without first announcing their presence and authority”). The same case-specific conclusion applies here. See also United States v. Banks, 540 U.S. 31, 40, 124 S.Ct. 521, 157 L.Ed.2d 343 (2003) (recognizing “opportunity to get rid of cocaine” as highly relevant to reasonableness of forced entry); United States v. Bynum, 362 F.3d 574, 581 (9th Cir.2004) (concluding no-knock entry justified where officers possessed “reasonable suspicion” that defendant “might dispose of the small rocks of crack cocaine” at issue upon becoming aware of their presence).
In urging otherwise, Judge Calabresi submits that the First Street apartment was “allegedly a ‘stash’ house,” where “enough drugs were present” to make it “quite unlikely that all of the drugs could have been disposed of had a knock-and-announce warrant been issued.” Calabresi Op., ante at 834 (emphasis in original). The facts cited by Judge Calabresi to support this conclusion, in fact, belie it. See id. The 7 grams of cocaine that the Cl saw in the First Street apartment translates to one-quarter ounce. Even assuming that 10 or 20 times that amount was “stashed” in the First Street apartment at any given time, this suggests a retail operation whose on-hand drug quantities could easily be disposed of quickly. Indeed, the conclusion is reinforced by Judge Calabre-si’s reference to the 100 grams or more of marijuana trafficked each week from the Griswold Heights apartment, which totals approximately one ounce. In any event, I hesitate to conclude that no-knock warrants should issue only when there is a risk that all the drugs sought will be destroyed if police first announce their presence. Drug quantity is, after all, an element of various federal drug trafficking crimes. See 21 U.S.C. § 841(b). Thus, even the partial destruction of drugs might “inhibit the effective investigation” of such crimes so as to support a no-knock warrant. Richards v. Wisconsin, 520 U.S. at 393, 117 S.Ct. 1416. Indeed, in Richards, the Supreme Court suggested that it was the impossibility of destroying the drugs being sought, not the unlikelihood of complete destruction, that might preclude a no-knock warrant. See id. (observing that where “drugs being searched for were of a type or in a location that made them impossible to destroy quickly,” no-knock warrant would not be necessary (emphasis added)).
*849 The facts thus far discussed were, in any event, all known to the magistrate who authorized a no-knock search. His finding of a reasonable suspicion of destruction is not undermined when the facts of McCol-ley’s record residence and lack of criminal record are added to a corrected affidavit. As the First Circuit has sensibly observed, “even an occupant not complicit in the drug crime” at issue may have a “strong motive to destroy evidence” upon learning that police are about to search the premises. United States v. Antrim, 389 F.3d 276, 281 (1st Cir.2004).
In addition to reasonable suspicion of evidence destruction, moreover, a corrected affidavit supports a reasonable suspicion of danger if officers had knocked and announced their presence before executing the four no-knock warrants obtained on June 27, 2008. While the original affidavit reported Riley’s general knowledge, based on training and experience, that drug dealers often possess firearms and may defend against police entries if given notice of a search warrant’s execution, the corrected affidavit indicates Riley’s specific knowledge, communicated to him by the Cl, that Sport, Stink, and Chuck all had access to and possession of firearms. See Escalera v. Lunn, 361 F.3d at 744 (stating that correcting process examines “all” information possessed by officers at time of warrant application). This was a case-specific, ar-ticulable basis for suspecting that the officers might confront armed persons if they knocked and announced their presence before entering the First Street apartment. See generally United States v. Ramirez, 523 U.S. 65, 71, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998) (upholding no-knock entry where informant notified police that violent prison escapee, with access to weapons, might be in home); United States v. Brown, 52 F.3d 415, 421-22 (2d Cir.1995) (holding no-knock entry reasonable where confidential informant told police that violent cocaine dealer was armed).
Judge Calabresi suggests that there is a dispute of fact as to whether the Cl in fact reported that Sport, Stink, and Chuck had access to and possession of firearms because Officer Rosney, one of the officers who participated in the search of the First Avenue apartment, in deposition testimony, answered “No” when asked if he had “any specific information from the informant” that individuals in that premises “were armed.” J.A. 259; see Calabresi Op. at 834. But as Rosney’s deposition testimony further shows, he did not participate in debriefing the Cl, see J.A. 138-39, so the fact that he had no specific information from the Cl about the targets’ firearms possession hardly undermines Riley’s representation as to what he was told by the CL In his own deposition, Riley was careful to testify that the information he had about weapons in the First Avenue Apartment was “nothing specific,” which is consistent, not' at odds, with Rosney’s deposition testimony. J.A. 411. But, as Riley made clear in his very next sentence, what he did know was that “[t]he informant, because he’s known some of these individuals for many, many years, knows them to carry firearms.” J.A. 411. Thus, the Operational Plan that Riley prepared on June 30, 2008, advised all officers participating in the July 3 searches that the “C/I states that Targets all have access to & possess firearms.” J.A. 149. Because Rosney was one of the officers listed to receive a copy of this plan, his negative response to a deposition query about Cl information can only be understood to indicate either that he had forgotten what he had read in the Operational Plan or, like Riley himself, did not consider it “specific information” of weapon possession, or did not consider it information that he himself had obtained from the Cl. In any event, it cannot be construed to create a genuine *850 dispute of fact as to Riley’s own report of what the Cl told him about the targets’ access to and possession of firearms. Thus, Riley’s Operation Plan statement is properly included in a corrected affidavit.
What police did not know was in which of the four apartments the targets would be found at the precise time of the searches. In this respect, Riley’s original affidavit told the judge who initially authorized the four no-knock entries that, based on the Cl’s information, Sport was thought regularly to reside at the 520 Second Avenue apartment while Stink was thought regularly to reside at the 17 101st Street premises, although occasionally staying at the Griswold Heights apartment. The issuing judge was told that Stink controlled the latter two premises as well as the First Street apartment, but he was never told that Stink, or any of the other confederates resided at or stayed in the First Street apartment. Rather, the judge was provided with facts indicating that the confederates stored drugs at the First Street location, and that the Cl had witnessed them packaging and retrieving drugs from that location within the last week. On these circumstances, the issuing judge could reasonably have concluded that, even if the target drug dealers did not reside at the First Street apartment, there was a sufficient possibility that one or more of them would be present and armed at the time of any search to support a reasonable belief that officers who knocked and announced their presence before entering would be at risk of harm.
No different conclusion obtains when the warrant affidavit is corrected to identify MeColley as the record resident of the First Street apartment. As just stated, the issuing judge knew that Sport and Stink both resided elsewhere. Further, as noted with respect to probable cause, the issuing judge knew that these drug dealers used another apartment occupied by a single mother and her children to deal drugs. Thus, identifying MeColley and her daughter as the residents of the First Street apartment would not have negated the facts supporting a reasonable suspicion of danger to the officers from announced entry. See generally United States v. Bas-ham, 268 F.3d 1199, 1204 (10th Cir.2001) (holding reasonable suspicion supporting no-knock warrant remained when application corrected to include presence of children in home). Indeed, their presence in the First Street apartment would only have enhanced the risk of harm, to McCol-ley and her daughter as well as the officers, if armed drug dealers on the premises were alerted to police execution of a search warrant.
In sum, because the “particular circumstances” of this case raised a real possibility that (1) executing officers could confront armed drug traffickers in any of the four apartments to be searched, and (2) the drugs thought to be stored in the First Street apartment were easily disposable, there was a sufficient basis to satisfy the “not high” requirements of reasonable suspicion articulated in Richards, 520 U.S. at 394, 117 S.Ct. 1416; see also United States v. Washington, 340 F.3d 222, 227 (5th Cir. 2003) (holding confidential informant report that “suspect was selling drugs and was typically armed ... sufficient to establish a reasonable suspicion of danger”).
2. The Corrected Affidavit Supports Arguable Reasonable Suspicion
Even if the corrected affidavit did not thus demonstrate reasonable suspicion to support a no-knock entry into the First Street apartment, Riley would still be entitled to qualified immunity as long as the affidavit established arguable reasonable suspicion, i.e., that it was objectively reasonable for Riley to believe that reason *851 able suspicion existed or that officers of reasonable competence could disagree as to whether the reasonable suspicion test was met. See Escalera v. Lunn, 361 F.3d at 743; Holeman v. City of New London, 425 F.3d 184, 191 (2d Cir.2005) (holding that even if “facts were insufficient to satisfy probable cause or reasonable suspicion,” officer’s “belief that they were was objectively reasonable, and therefore protected by qualified immunity”); see also Eldredge v. Town of Falmouth, 662 F.3d 100, 106 (1st Cir.2011) (holding arguable reasonable suspicion sufficient to support qualified immunity); Jackson v. Sauls, 206 F.3d 1156, 1165-66 (11th Cir.2000) (same). For the reasons stated in the preceding section, I think we must conclude that Riley had at least arguable reasonable suspicion to think that evidence would be destroyed and officers would be in danger if they knocked and announced their presence before entering the four apartments, including the First Street apartment, associated with the targets of the drug trafficking then under investigation.
That conclusion is only reinforced by our case law, which indicates that when Riley applied for the no-knock warrants at issue in 2008, it was hardly clear that reasonable suspicion was absent here. See Gonzalez v. City of Schenectady, 728 F.3d at 154 (“[Qjualified immunity shields official conduct that is objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken.” (internal quotation marks omitted)). Indeed, recent summary orders from this court have identified reasonable suspicion in circumstances bearing some similarities to this case. See United States v. Harper, 421 Fed.Appx. 108, 110 (2d Cir.2011) (upholding no-knock warrant where officers “reasonably believed that firearms were present in Harper’s home and that announcing their presence therefore would be dangerous”); United States v. McCloud, 303 Fed.Appx. 916, 918 (2d Cir.2008) (holding challenged no-knock authority supported by reasonable suspicion based on “affiant’s experience that the drug evidence that was the object of the search could be readily destroyed upon notice of entry”); see also United States v. Tisdale, 195 F.3d 70, 73 (2d Cir.1999) (holding that, where drugs at issue were described in warrant affidavit as being in “readily disposable form,” it was not “entirely unreasonable” for officer to rely on no-knock warrant (internal quotation marks omitted)).
In sum, based on the particularized information in the corrected affidavit detailed in this opinion, as well as our own case law, it cannot be said that Riley was “plainly incompetent” or “knowingly vio-latefd] the law” in concluding that reasonable suspicion of danger and evidence destruction supported a no-knock entry into the First Street apartment. Malley v. Briggs, 475 U.S. at 341, 106 S.Ct. 1092. * * *
To conclude, because I am convinced that the challenged search warrant is supported, as a matter of law, by both probable cause to search the First Street apartment and reasonable suspicion to do so on a no-knock basis — or at least by arguable probable cause and arguable reasonable suspicion — I respectfully dissent from the decision to dismiss this case for lack of jurisdiction. I would instead enter judgment in favor of Riley on the ground of qualified immunity.

. Judge Calabresi is mistaken in suggesting that our precedent is ambiguous as to whether probable cause can be decided as a matter of law based on a corrected affidavit. See Calabresi Op., ante at 828-32. Certainly Gol-ino v. City of New Haven, 950 F.2d 864 (2d Cir.1991), which he cites, does not signal ambiguity. There, omitted facts contradicted virtually every fact reported to establish probable cause. See id. at 867 (contrasting, for example, (1) reported incriminating statements of murder target’s ex-wife with her unreported inconsistent, and even contradictory, statements; (2) reported informant statement linking target and victim with informant's unreported testimonial denial of statement; and (3) reported general description of killer with unreported eyewitnesses’ detailed descriptions not fitting target, as well as noting complete failure to disclose that killer’s blood type was known and had not yet been compared to target’s (which comparison would subsequently exculpate target)). In such circumstances, where a corrected affidavit presents conflicts of fact determinative of probable cause, a reviewing court could not decide probable cause as a matter of law without knowing how the issuing magistrate might have resolved those conflicts — itself a question of fact. See id. at 872. Indeed, unless a magistrate could reasonably discount the contradictions — which is hardly evident from the corrected affidavit in Golino — probable cause would be defeated as a matter of law. Thus, the corrected affidavit, viewed most favorably to the plaintiff, could not admit a finding of probable cause or even arguable probable cause. See Golino v. City of New Haven, 761 F.Supp. 962, 971-72 (D.Conn.1991) (Cabranes, D.J.) (concluding that court could not decide as a matter of law whether “it was objectively reasonable for [officers] to believe that they were acting in a fashion that did not violate [Golino’s] established federally protected rightfs]” (internal quotation marks omitted)).
By contrast, here, the omitted facts do not contradict, but only supplement, reported facts. Moreover, for reasons discussed further in this opinion, those supplemental facts, *840 even when viewed favorably to McColley, cannot bear a weight sufficient to defeat the probable cause otherwise established, much less arguable probable cause. Thus, our precedent makes clear that both probable cause and arguable probable cause can be decided favorably to Riley as a matter of law based on the corrected affidavit. See United States v. Rajaratnam, 719 F.3d at 149-50 & n. 11, 157 & n. 21; Walczyk v. Rio, 496 F.3d at 157; Escalera v. Lunn, 361 F.3d at 744; Smith v. Edwards, 175 F.3d at 105; Velardi v. Walsh, 40 F.3d at 574.

. Regular type is used to detail facts reported in the original affidavit; italics are used to detail facts known but omitted from that affidavit.

. Probable cause is not backward looking. Thus, the results of a search are immaterial to a determination of whether the search was supported by probable cause. See United *842 States v. Ramirez, 523 U.S. 65, 71 n. 2, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998) ("In determining the lawfulness of entry and the existence of probable cause we may concern ourselves only with what the officers had reason to believe at the time of their entry.” (emphasis in original; alteration and internal quotation marks omitted)); United States v. Di Re, 332 U.S. 581, 595, 68 S.Ct. 222, 92 L.Ed. 210 (1948) ("[A] search is not to be made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success.” (footnote omitted)). Just as the discovery of incriminating evidence in the course of a search cannot establish probable cause where none existed, the failure to discover such evidence cannot undermine a satisfactory showing of probable cause. Thus, the failure to find drugs at any of the premises searched in this case is immaterial to our assessment of probable cause.

. To the extent the Cl described Stink as being in "custody and control” of the three apartments for which search warrants were being sought, the issuing judge already knew from the information provided about Tanisha Bruce that this did not signal exclusive custody or control or preclude another person from being the record resident of the apartment.

. Insofar as McColley challenged the degree of force used in executing the no-knock warrant, the district court dismissed this claim as insufficient as a matter of law. This ruling is not before us on this appeal.